ANNEX 2






Enterprise Improvement    Corporate Turnaround and Restructuring    Financial Advisory Services    Information Management Services



# Project Hermitage
# Restructuring

March 6 2013



EXHIBIT

F

DEKABANK copy, March 6 2013

www.alixpartners.com

# Important Disclaimer

This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). THIS REPORT IS NOT INTENDED TO BE RELIED UPON BY ANYONE OTHER THAN THE COMPANY, OR INDUCE ACTION OR FORBEARANCE BY ANYONE OTHER THAN THE COMPANY. This Report is strictly confidential and subject to the confidentiality provisions of the Engagement Letter.

The addressee of the Report is the Company. The Report may be made available to the following lenders: HSH Nordbank AG, DVB SE, Dekabank, Commerzbank AG, Bremer Landesbank, Norddeutsche Landesbank, Lloyds TSB Bank Plc, Natixis, Santander (the "Lenders") on a strict non-reliance basis only and subject to the provisions of this disclaimer. By taking receipt of this Report, the Lenders accept and agree to the non-reliance limitation set forth in the preceding sentence and the other provisions in this disclaimer. No other person other than the Company and the Lenders is authorized to have access to this Report, unless he has received AlixPartners' prior written consent and has signed and returned to AlixPartners an acceptable non-reliance report letter.

Should any unauthorized person obtain access to and read this Report, such person accepts and agrees to the following terms:

1.  The unauthorized reader of this Report understands that the work performed by AlixPartners was performed in accordance with the instructions provided by the Company and was performed exclusively for the Company's sole benefit and internal use.

2.  The unauthorized reader of this Report acknowledges that this Report was prepared at the direction of the Company and may not include all procedures deemed necessary for the purposes of the unauthorized reader.

3.  The unauthorized reader agrees that AlixPartners, its partners, employees and agents neither owe nor accept any duty or responsibility to the unauthorized reader, whether in contract or in tort (including without limitation, negligence and breach of statutory duty), and shall not be liable in respect of any loss, damage or expense of whatsoever nature which is caused by any use the unauthorized reader may choose to make of this Report, or which is otherwise consequent upon the gaining of access to the Report by the unauthorized reader. Further, the unauthorized reader agrees that this Report is not to be referred to or quoted, in whole or in part, in any prospectus, registration statement, offering circular, public filing, loan, other agreement or document, and this Report is not to be distributed without AlixPartners prior written.

DEKABANK copy  March 6 2013

AlixPartners

# Important Disclaimer

The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company. AlixPartners further relied on the assurance of management and staff of the Company that they were unaware of any facts that would make the information provided to AlixPartners incomplete or misleading. In preparing the Report, AlixPartners has assumed, without any independent verification, the accuracy and completeness of all information received from the Company, available from public sources, or which was otherwise provided to us. AlixPartners is not responsible whatsoever for any misrepresentations made to AlixPartners during the course of its review. AlixPartners has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards.

Accordingly, AlixPartners cannot and does not express an opinion on the financial information and does not assume any responsibility for the accuracy or correctness of the projected financial or other data, information and assessments upon which the enclosed document is presented. AlixPartners expresses no view as to the accuracy, completeness or likelihood of the Company's business plan, scenarios, projections or forecasts contained in this Report.

The recipients of the Report, including the Lenders, accept that they will make their own investigation, analysis and decision relating to the possible or actual transaction/financing/credit relationship and/or matter related to such and will not use or rely upon this Report to form the basis of any such decisions. The Report cannot in any way serve as a substitute for inquiries and procedures which the Lenders will or should be undertaking for the purposes of satisfying themselves regarding the Client's business or financial position or for any other purpose in connection with the Lenders' relationship or transaction with the Client.

AlixPartners makes no representation or warranty regarding any actions the Lenders may or may not take in reliance on or in reference to matters presented in the Report. The Lenders accept and agree that AlixPartners, its affiliates, members, officers, partners, employees and agents (the "AlixPartners Entities") neither owe nor accept any duty or responsibility to the Lenders, whether in contract or in tort (including without limitation, negligence and breach of duty of any sort) or however otherwise arising. Any reliance the Lenders choose to place on the information or the Report is a matter of their judgment exclusively and at their own risk. Accordingly, no liability or responsibility whatsoever is accepted by the AlixPartners Entities for any loss howsoever arising from any use of, or in connection with, the Report.

The information in this Report is non-public and considered strictly confidential by the Company and AlixPartners.

3

AlixPartners

DEKABANK copy, March 6 2013

# Important Disclaimer

This Report includes analyses of the Company's financial projections. These projections may be based, in whole or in part, on projections or forecasts of future events. A forecast, by its nature, is speculative and includes estimates and assumptions which may prove to be wrong. Actual results may, and frequently do, differ from those projected or forecast. Those differences may be material. Items which could impact actual results include, but are not limited to, unforeseen micro- or macro-economic developments, business or industry events, personnel changes, casualty losses, or the inability of the Company to implement plans or programs. The projections are also based upon numerous assumptions, including business, economic and other market conditions. Many of these assumptions are beyond the control of the Company and are inherently subject to substantial uncertainty. Such assumptions involve significant elements of subjective judgment, which may or may not prove to be accurate, and consequently, no assurances can be made regarding the analyses or conclusions derived from financial information based upon such assumptions.

The report is incomplete without reference to, and should be viewed solely in connection with, the oral briefing provided by AlixPartners which forms part of the Report.

The information in the Report reflects conditions and the views of AlixPartners as of this date, all of which are subject to change. AlixPartners undertakes no obligation to update or provide any revisions to the Report to reflect events, circumstances or changes that occur after the date the Report was prepared.

To the extent that any of the AlixPartners Entities provide any recipient of this Report with an oral presentation or explanations in relation to the Report or Client, the recipient of this Report acknowledges that such presentation and explanation will be given subject to the same terms and conditions as those specified in this disclaimer.

Neither the Report nor any of its contents may be copied, reproduced, disseminated, quoted or referred to in any presentation, agreement or document, with or without attribution to AlixPartners, at any time or in any manner other than for the internal use of the Company, without the express, prior written consent of AlixPartners.

DEKABANK copy, March 8, 2013

AlixPartners



# Contents

I.    Executive Summary / Remarks from the Company

II.   Background

III.  Restructuring Proposal

IV.   Financial Analysis

V.    Conclusions

DEKABANK copy. March 6 2013

AlixPartners



I. Executive Summary

DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRIVILEGED

# Executive Summary

▸ The November 20 Proposal provides the basis for a formal or informal standstill period during which the Company can develop, negotiate and implement a structure providing a viable long term solution

▸ The November 20 Proposal has shown to be effective as an interim measure providing liquidity and stability to the Company but it is unlikely to provide a definitive solution. One significant obstacle to its long-term implementation is the transfer of cash flows away from banks towards charterers

▸ In considering alternatives for a financial restructuring, the Company sought to achieve the following key objectives:
  – Compensate stakeholders adequately for their risk-weighted capital exposure and concessions
  – Constrain cross subsidization between stakeholders related to different underlying assets
  – Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests)
  – Maximize options for stakeholders and potential for self-selection

▸ A long term plan involves grouping and ringfencing assets according to their debt service capacity and sensitivity to a recovery in rates.

▸ This can be achieved by executing arms-length sale transactions of the [SPVs] at market value into appropriate newcos:
  a) Newco Alpha: up to 29 vessels (mostly Tanker operations) financed by "Hamburg" banks, Natixis, Credit Europe (including Second Lien), NSF Second Lien and Lloyds; Alpha to be partially recapitalized with new equity and financed through 5 different facilites
  b) Newco Beta: 4 vessels financed by CCB and CDB.
  c) Group C: GB Global, NSF (South and East)
  d) Group D: the remaining vessels, essentially comprised of Icon, Octavian, Stealth, FSL

DEKABANK copy, March 6 2013

AlixPartners



II. Background

DEKABANK copy, March 6 2013

AlixPartners



# Background
## The Market

▸ Neither the tanker nor the bulker market recovered through 2012 and vessel earnings have remained low
   – The tanker market has shown signs of firmness in Q1 2013 but there is little optimism for a sustained recovery before Q3 2013
   – The bulker market continues to be very weak and has performed slightly below the Nov 20 Business Plan forecast during Q1 2013

▸ Asset values have continued to deteriorate through the end of 2012. The latest levels as per Clarkson Research sustained decline to multiyear lows:
   – 5yr old VLCC, Aframax and Product tankers at $57m, $28m, and $22m
   – 5yr old Capesize, Panamax, and Handysize at $33m, $18m, and $16m



Capesize (180k DWT, 5 Yr Old in $m)
Panamax (76k DWT, 5 Yr Old in $m)
Handysize (32k DWT, 5 Yr Old in $m)



VLCC (310k DWT, 5 Yr Old in $m)
Aframax (105k DWT, 5 Yr Old in $m)
Product Tanker (37k DWT, 5 Yr Old in $m)

Source: Clarkson Research

AlixPartners

DEKABANK copy, March 6 2013



# Background

## The Company

▸ The Company has actively been managing its portfolio since 2008, mainly via:
  – The investment of c.$700m in equity along with $1.8B of bank and sale-leaseback (18) financing
  – The Sale of 12 vessels upon delivery for net proceeds of $136m
  – The Sale of 17 vessels operating within the fleet for net proceeds of $79m
  – The sale –leaseback of 18 vessels to finance $665m in deliveries of which 7 in 2013 ($171m)

▸ Earnings from vessels financed by banks have fallen $45m short of debt service in the period 2011-2012. Similarly, earnings from bareboat vessels have fallen $43m short of obligations in the period 2011-2012.

▸ In order to maintain minimum operational liquidity, the Company has instituted a moratorium during the first quarter including the following measures
  – Deferral of 100% from all lenders other than CCB and CDB who have already agreed to a debt rescheduling starting from Q4 2012
  – Deferral of some November and December 2012 principal repayments
  – Deferral of 35% of the bareboat hire payments
  – Refinancing of Royal via Credit Europe facility; Repayment of 2012 bank principal overdue [1]
  – Management of supplier overdue through the quarter

▸ While all stakeholders have reserved their rights, some specific stakeholder actions have affected the cash flows
  – Unicredit has drawn on its deposit accounts
  – Icon issued a lien notice to the charterers and has directly received charter income

▸ With above measures and actions, available cash is projected at only c.$23.8m including retention at the end of March and c.$7.5m in restricted cash deposits

---

[1] Does not include default interest, margin increases and bank fees

DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRELIMINARY

# Company and Fleet Overview

The Company – Recent Events

▸ Flash

    1.  The Flash ran aground at the end of June and is currently arrested in Tunisia

    2.  The customer has invoked damage of goods (wet coal) and has refused to take delivery

    3.  180 days have elapsed as of Feb 2013, potentially giving rise to a Constructive Total Loss on a hull coverage of $110m

    4.  The claim has been rejected by the Club on the basis that the damage is to cargo

    5.  An arbitrator is to be appointed week of Mar 4 2013

▸ Baytur

    1.  Baytur is expected to be delivered in the first week of April for $13.6m in proceeds

▸ Royal Refinancing

    1.  The Royal was refinanced through a $37.5m facility with Credit Europe

    2.  Credit Europe has cross-collateralized its second lien on the Namrun and the Scope (behind Natixis) with a second mortgage on the Royal

    3.  $10m has been paid to HSH and $10m is outstanding to the yard

DENKABANK Copy March 6 2013

AlixPartners

# Company and Fleet Overview
Employment, Tanker

PRIVATE & CONFIDENTIAL

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tankers | | | | | | | | | |

| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | MT AQUA | Aframax Tanker | 12,675 | CHEVRON | Apr-13 | - | 12,675 | Oct-13 | 6 |
| 2 | MT ACTION | Aframax Tanker | 12,706 | URSA SHIPPING | Mar-13 | - | 12,706 | May-13 | 2 |
| 3 | MT TARGET | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 4 | MT TRUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 5 | MT SPIKE | Aframax Tanker | 12,825 | URSA SHIPPING | Mar-13 | - | 12,825 | Oct-13 | 6 |
| 6 | MT AVOR | Aframax Tanker | 13,063 | URSA SHIPPING | Aug-13 | - | 13,063 | Feb-14 | 6 |
| 7 | MT VALUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 8 | MT BRAVO | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 9 | MT POWER | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 10 | MT PROFIT | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 11 | MT CENTER | Suezmax Tanker | 15,675 | NIDAS | Jun-13 | - | 19,500 | Jun-14 | 12 |
| 12 | MT BLUE | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 13 | MT PINK | Suezmax Tanker | 36,834 | GLENCORE | Jun-15 | - | 36,834 | Jun-15 | - |
| 14 | MT BLANK | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 15 | MT REEF | Suezmax Tanker | 37,080 | GLENCORE | Jul-15 | - | 37,080 | Jul-15 | - |
| 16 | MT HERO | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 17 | MT ROYAL | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 18 | MT ENJOY | Panamax Tanker | 13,825 | CSSA | Mar-14 | - | - | Mar-14 | - |
| 19 | MT MARKA | Panamax Tanker | 11,959 | Panamax International (P.I.) | Jun-13 | - | 12,925 | Dec-13 | 6 |
| 20 | MT CITRON | MR Pro/Chem Tanker | 13,380 | SHELL | May-13 | - | 13,380 | Jul-13 | 2 |
| 21 | MT CITRUS | MR Pro/Chem Tanker | 13,380 | SHELL | Jul-13 | - | 13,380 | Sep-13 | 2 |
| 22 | MT ACOR | Ice Class Pro/Chem Tanker | 11,700 | NORDEN | Apr-13 | - | - | May-13 | 1 |
| 23 | MT CARRY | Ice Class Pro/Chem Tanker | 11,150 | NORDEN | Aug-13 | - | - | Sep-13 | 1 |
| 24 | MT ROVA | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 25 | MT COTTON | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 26 | MT CARGO | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | May-13 | - | - | Jun-13 | 1 |
| 27 | MT ROCK | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Mar-13 | - | - | Apr-13 | 1 |
| 28 | MT ROCKET | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Jun-13 | - | - | Jul-13 | 1 |

DEKABANK copy, March 6 2013

AlixPartners

DRAFT - PRELIMINARY

# Company and Fleet Overview
Employment, Bulk

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bulkers** | | | | | | | | | | |
| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) | |
| 31 | MV SCOPE | Capesize Bulk Carrier | 10,000 | SWISS MARINE | Oct-13 | - | - | May-14 | 7 | |
| 32 | MV FLASH | Capesize Bulk Carrier | | ARRESTED | - | - | - | Jan-00 | - | |
| 33 | MV PROUD | Capesize Bulk Carrier | 56,000 | COSCO | Jun-14 | - | - | Jun-14 | - | |
| 34 | MV ANGEL | Capesize Bulk Carrier | 4,533 | SWISS MARINE | Mar-13 | - | - | Mar-13 | - | |
| 35 | MV PRETTY | Capesize Bulk Carrier | 7,600 | SWISS MARINE | Feb-13 | - | - | May-13 | 3 | |
| 36 | MV CASH | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - | |
| 37 | MV COLLECTION | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - | |
| 38 | MV CITY | Kamsarmax Bulk Carrier | | N/A | - | - | - | Jan-00 | - | |
| 39 | MV ASIA | Supramax Bulk Carrier | 7,014 | SUPREME BULK CARRIERS | Jan-13 | - | 7,014 | Apr-13 | 3 | |
| 40 | MV FANTASTIC | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 | |
| 41 | MV AMAZING | Supramax Bulk Carrier | 7,267 | SUPREME BULK CARRIERS | Feb-13 | - | 7,267 | May-13 | 3 | |
| 42 | MV TARSUS | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | May-13 | - | 6,978 | Jul-13 | 2 | |
| 43 | MV SPOT | Supramax Bulk Carrier | 10,925 | COPA | Feb-13 | - | - | Feb-13 | - | |
| 44 | MV CLEAR | Supramax Bulk Carrier | 5,850 | Denmar Chartering & Trading GMBH Hamburg, Germany | May-13 | - | 5,850 | May-13 | - | |
| 45 | MV NAMRUN | Supramax Bulk Carrier | 7,256 | SUPREME BULK CARRIERS | Jan-13 | - | 7,256 | Apr-13 | 3 | |
| 46 | MV BAYTUR | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 | |
| 47 | MV SOUTH | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 | |
| 48 | MV EAST | Supramax Bulk Carrier | 8,422 | WORLDWIDE INVESTMENT | Feb-13 | - | 8,422 | Feb-13 | - | |
| 49 | MV WEST | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Jan-13 | - | 7,219 | Apr-13 | 3 | |
| 50 | MV SECRET | Supramax Bulk Carrier | 8,422 | SUPREME BULK CARRIERS | Jan-13 | - | 8,422 | Apr-13 | 3 | |
| 51 | MV SHARP | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 | |
| 52 | MV CAPITAL | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 | |
| 53 | MV METROPOL | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Mar-13 | - | - | Jan-00 | - | |
| 54 | MV WORLD | Supramax Bulk Carrier | 8,265 | SIVA BULK | Apr-13 | - | 8,265 | Jul-13 | - | |
| 55 | MV EARTH | Mini Bulk Carrier | | On Spot | - | - | - | Jan-00 | - | |
| 56 | MV WIND | Mini Bulk Carrier | | On Spot | - | - | - | Jan-00 | - | |
| 29 | MT CV STEALTH | Aframax Tanker | 11,700 | PT Armada | Mar-13 | - | 11,700 | Apr-13 | 1 | |
| 30 | MT CS STEALTH | Aframax Tanker | 12,255 | Petrovietnam Transport Corp | Mar-13 | - | 12,255 | Mar-13 | - | |

AlixPartners

DEK - BANK copy March 5 2013



DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRELIMINARY

# Restructuring Proposal
## Key Assumptions

▸ Key assumptions under the Plan include
- All ships sold **at minimum of market value or value of loan** and on an arms-length basis.
- There will be **some change in the ownership** in the go-forward entities Newco Alpha and Beta (in order to protect relevant lenders from sister ship arrests in South Africa - type jurisdictions)
- Stakeholders in groups **C and D will have the option to move into A** subject to loan modifications adhering to the conditions prevalent in that entity.
- Stakeholders in **C and D can have their vessels redelivered** subject to acceptable terms for termination.

▸ The Company would prefer a coordinated financing approach in Newco

▸ The Second Lien debt relating to NSF and Credit Europe is transferred/novated upon the sale. There may be an opportunity to renegotiate terms of mezzanine debt (NSF, Credit Europe) as part of the sale but it has not been contemplated here

▸ Deposits related to facilities (Unicredit, Profit, etc.) are netted the outstanding loan amounts; the loans are reconstituted after the transaction and the deposits are eliminated

DEKABANK copy, March 8 2013



DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco A
## Newco A Example

▸ **Newco Alpha:** Intended to form a viable standalone entity of up to 29 vessels (21 Tanker and 8 Bulker) in which the quality of vessel earnings would enable limited deferrals compared to those required in the November 20 proposal; New equity provided in the transaction to reduce total bank exposure and improve LTV coverage ratio for the majority of the facilities

▸ **Assumptions : 1)** Sale of ships at market value from Olco to Newco **2)** Equity to fund any shortfall in collateral in Oldco **3)** New bank financing in Newco provided at 95% LTV **4)** New Equity in Newco as required for 95% LTV.



Note: Indicative transaction structure subject to legal due diligence
[1] Equity of $1.1m also as a result of transfer of Namrun at value greater than senior debt
[2] $52.6m financed in excess of market value of assets

DERABANK copy   March 6 2012

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha
## Structuring: Facility #1

▸ **Facility#1:** Newco Alpha financing at 95% LTV, LIBOR +3% on a 15 year loan profile from delivery date based 20 year working life minus 5 years. Pro Forma debt in Facility#1 includes second liens behind Natixis related to Credit Europe ($16.1m)

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A] Actual Outstanding Loan[1] | [B] Current Estimated Value | [C] Excess / (Shortfall) upon sale [B-A] | [D] Capital required in NewCo (LTV of 95%) [A*(1-95%)] | [E] Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | [F] Equity going into OldCo [Positive C] | [G] New debt drawdown [D-A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FACILITY #1** | | | Hamburg banks paid down to 95% LTV including any current shortfalls | | | | | | | | |
| Aframax | NLB | Target | 99% | 95% | 28.7 | 29.0 | 0.3 | 1.5 | 1.5 | 0.3 | 27.6 |
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | (2.4) | 1.6 | 4.0 | 0.0 | 29.5 |
| Aframax | Unicredit | Value | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Bravo | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Power | 97% | 95% | 31.9 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |
| Suezmax | CB NLB BrLB | Blue | 99% | 95% | 40.5 | 41.0 | 0.5 | 2.1 | 2.1 | 0.5 | 39.0 |
| Suezmax | H5H 1 | Hero | 99% | 95% | 48.5 | 49.0 | 0.5 | 2.5 | 2.5 | 0.5 | 46.6 |
| MR | H5H 2 | Citron | 107% | 95% | 22.5 | 21.0 | (1.5) | 1.1 | 2.6 | 0.0 | 20.0 |
| MR | H5H 2 | Citrus | 107% | 95% | 23.6 | 22.0 | (1.6) | 1.1 | 2.7 | 0.0 | 20.9 |
| Handy | DVB NLB SAN | Acor | 96% | 95% | 20.1 | 21.0 | 0.9 | 1.1 | 1.1 | 0.9 | 20.0 |
| Handy | DVB NLB SAN | Carry | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB SAN | Rova | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cotton | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cargo | 91% | 95% | 21.0 | 23.0 | 2.0 | 1.2 | 1.2 | 2.0 | 21.9 |
| Handy | DVB NLB | Rock | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handy | DVB NLB | Rocket | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handymax | DVB | Asia | 102% | 95% | 19.4 | 19.0 | (0.4) | 1.0 | 1.3 | 0.0 | 18.1 |
| Mini Bulker | DVB | Earth | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| Mini Bulker | DVB | Wind | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| **Subtotal Facility #1** | **20** | | **99%** | **95%** | **504.7**[1] | **511.0** | **(5.9)**[2] | **25.6** | **31.5**[3] | **12.2** | **485.5** |

[1] To be adjusted for repayments before closing of the transaction (figures do not include principal repayments made week ending Feb 22)
[2] Represents sum of shortfall only
[3] Total amount of equity related to sale / purchase of vessels in Facility #1
[4] $4.1m related to excess collateral in Unicredit facility could be eliminated and repaid/refinanced through NSF 2nd Lien

DEKABANK copy, March 8 2013

AlixPartners



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #1



1. True is sold from Oldco to Newco Alpha at market value $31m (B)
2. Any shortfall against the mortgage is funded by $2.4m new equity (C) and the whole of the Oldco debt is paid down. If there is value above the mortgage, the excess cash remains in Oldco
3. NLB and New Equity recapitalize Newco at a maximum of 95% LTV; NLB has reduced its exposure by $3.9m and improved LTV by 13%



# Plan B – Split of Fleet via Newco: Alpha

## Structuring – Example #2



| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale (B-A) | (D) Capital required in NewCo (LTV of 95%) (B*(1-95%)) | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency (D-Negative C) | (F) Equity going into OldCo (Positive C) | (G) New debt drawdown (B - E) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | Profit | [illegible] | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | [illegible] |

1. Profit is sold from Oldco to Newco Alpha at $41m market value (B)
2. If there is value above the mortgage, the excess cash remains in Oldco (C). Any shortfall would need to be funded via additional equity
3. DVB and New Equity recapitalize Newco at maximum of 95% LTV; NLB has reduced its exposure by $0.4m and improved LTV by 1%




Note: indicative transaction structure subject to legal due diligence



AlixPartners

DEKABANK copy March 6 2013



DRAFT & PRIVILEGED

# Plan B – Split of Fleet via Newco: Alpha

## Structuring

- Facility#2: Lloyds vessels sold and refinancing provided on the same terms
- Facility#3: Natixis vessels sold and refinancing provided on the same terms; Namrun facility extended and ship potentially sold in 2-3 yrs
- Facility#4: Credit Europe sold and refinancing provided on the same terms
- Facility#5: Dekabank vessels sold and refinancing provided on PAYC basis and no covenants
- Facility#6: NSF Second Lien behind Unicredit on the same terms

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 55%) [B*(1-55%)] | (E) Capital required in NewCo (LTV of 55%) and to cover deficiency into DEKA [Deduplicate C] | (F) Equity going into DEKA [Positive C] | (Z) New debt drawdown [B - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FACILITY #2** | **Lloyds facility rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Suezmax | Lloyds | Park | 68% | 83% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |
| Suezmax | Lloyds | Blank | 68% | 68% | 32.2 | 47.0 | 14.8 | 14.8 | 14.8 | 14.8 | 32.2 |
| Suezmax | Lloyds | Reef | 75% | 75% | 34.6 | 46.0 | 11.4 | 11.4 | 11.4 | 11.4 | 34.6 |
| **FACILITY #3** | **Natixis facilities rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Capesize | Natixis 1 | Scope | 87% | 87% | 23.4 | 27.0 | n/a | n/a | n/a | n/a | 23.4 |
| Handymax | Natixis 2 | Namrun | 88% | 88% | 14.0 | 16.0 | n/a | n/a | n/a | n/a | 14.0 [2] |
| **FACILITY #4** | **Loan includes $37.5m new refinancing from Credit Europe plus $16.1m 2nd priority loans relating to the Scope and the Namrun** | | | | | | | | | | |
| Suezmax | Credit Europe | Royal | 107% [1] | 107% | 53.6 | 50.0 | n/a | n/a | 0.0 | 0.0 | 53.6 |
| **FACILITY #5** | **Deka facility rolled over into Newco but paid only from available cash from these vessels** | | | | | | | | | | |
| Handymax | Deka | Tarsus | 133% | 133% | 24.0 | 18.0 | n/a | n/a | n/a | n/a | 24.0 |
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| Handymax | Deka | Clear | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| **FACILITY #6** | **NSF 2nd Lien facilities** | | | | | | | | | | |
| | | | n/a | n/a | 25.5 | n/a | n/a | | | | 25.5 |
| **TOTAL Newco Alpha** | 29 | | 97% | 95% | 799.3 | 795.0 | (5.9) [3] | 58.5 | 64.4 | 44.6 | 784.0 |

MV of Newco Alpha Assets

Total Capital required

New Alpha debt

(1) Royal refinancing includes second lien ; LTV on first lien is 75%
(2) Equity value from the rollover of the Namrun loan on $16m in MV; equity not retained by Oldco due to 2nd Lien by Credit Europe
(3) Represents sum of shortfall only

DEKABANK copy   March 6 2013

AlixPartners



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #3



1. Pink is sold from Oldco to Newco Alpha at market value (B)
2. The excess cash over the mortgage value remains in Oldco (C)
3. Lloyds and New Equity recapitalize Newco at a maximum of 95% LTV; Given that coverage is lower than 95% (85%,) <u>no new equity is required upon refinancing of Newco with $37.3m in debt</u>



Note: Indicative transaction structure subject to legal due diligence

AlixPartners

DEKABANK copy, March 5 2013



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #4



| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | | 0.0 | 0.0 | 0.0 | 25.0 |

1. Spot is sold from Oldco to Newco Alpha at $25m being equivalent to outstanding loans
2. Loans are novated to Newco
3. Loans are paid out of available cash on the vessel only

Amount of loan novated is beyond market value at the time of the transaction; no recapitalization



Note: Indicative transaction structure subject to legal due diligence

22

AlixPartners

DEKABANK copy. March 6 2013

DRAFT – FOR DISCUSSION

# Plan B – Split of Fleet via Newco: Alpha
Structuring – Sources and Uses, Pro Forma Balance Sheet

| Sources | | Uses | |
|---|---|---|---|
| New equity [1] | 64.4 | Purchase of assets | 784.0 |
| New financing | 784.0 | Net bank debt paydown | 19.3 |
| | | Equity to cover collateral shortfall and excess value | 45.1 |
| **Total Sources** | **$848.4** | **Total Uses** | **$848.4** |

[1] Does not include additional liquidity for operational cash

DEKABANK copy. March 6 2013

AlixPartners



# Plan B – Split of Fleet via Newco: Beta
Structuring

▸ **Newco Beta:** Contains 4 Bulkers financed by Chinese banks. These are considerably under water yet they must be offered attractive terms given that the Chinese banks benefit from a Corporate Guarantee.

▸ **Assumptions :** Loans novated to Newco Beta on existing terms. **Subject to an appropriate rescheduling of obligations we do not envisage equity being required for Newco Beta.**

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A] Actual Outstanding Loan | [B] Current Estimated Value |
|------|----------|------|-------------|---------------|------------------------------|------------------------------|
| Capesize | CCB | Flash | 100% | 100% | 33.1 | 33.0 |
| Capesize | CCB | Proud | 100% | 100% | 33.1 | 33.0 |
| Capesize | CDB | Angel | 119% | 119% | 43.0 | 36.0 |
| Capesize | CDB | Pretty | 125% | 125% | 45.1 | 36.0 |
| **Total Newco Beta** | | **4** | **112%** | **112%** | **154.3** | **138.0** |

DEKABANK copy. March 6 2013

AlixPartners

DEKA – CONFIDENTIAL

# Plan B – Split of Fleet via Newco: Group C

Structuring

▸ **Group C:** Contains 11 Bulkers financed by GB Global as well as the NSF-financed vessels.

▸ **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Subject to adequate concessions, facilities could opt into Newco Alpha or desist from participation and take ships back

| Type | Facility | Name | Current LTV | Pro Forma LTV | [A]<br>Actual<br>Outstanding<br>Loans | [B]<br>Current<br>Estimated<br>Value |
|------|----------|------|-------------|---------------|--------------------------------------|--------------------------------------|
| Kamsarmax | GB Global | Cash | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | Coll./Chance | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | City | 96% | 96% | 26.0 | 27.0 |
| Handymax | NSF | South | 84% | 84% | 19.3 | 23.0 |
| Handymax | NSF | East | 84% | 84% | 19.3 | 23.0 |
| Handymax | GB Global | West | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Secret | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Sharp | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Capital | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Metropol | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | World | 103% | 103% | 23.7 | 23.0 |
| **Total Group C** | | **11** | **98%** | **98%** | **258.8** | **265.0** |

DEKABANK copy, March 8 20

AlixPartners



# Plan B – Split of Fleet: Residual Oldco: Group D
Structuring

‣ **Group D, Geden Oldco:** 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable. Baytur will be sold April 2013.

‣ **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Proceeds from the sale to Newco Alpha would provide liquidity to pay down payables.

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan (PV of lease) | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Aframax | FSL | Aqua | 234% | 234% | 60.8 | 26.0 |
| Aframax | FSL | Action | 234% | 234% | 60.8 | 26.0 |
| Aframax | Stealth | Spike | 177% | 177% | 55.0 | 31.0 |
| Aframax | Stealth | Avor | 176% | 176% | 54.5 | 31.0 |
| Suezmax | Icon 1 | Center | 145% | 145% | 67.9 | 47.0 |
| Panamax | Octavian 1 | Enjoy | 141% | 141% | 42.2 | 30.0 |
| Panamax | Octavian 2 | Marka | 128% | 128% | 41.0 | 32.0 |
| Handymax | Icon 2 | Fantastic | 157% | 157% | 29.9 | 19.0 |
| Handymax | Icon 2 | Amazing | 157% | 157% | 29.9 | 19.0 |
| Chartered - Afra_Tanker | not ours | CV Stealth | | | | |
| Chartered - Afra_Tanker | not ours | CS Stealth | | | | |
| **Subtotal SPVs** | | **11** [1] | **169%** | **169%** | **441.9** | **261.0** |
| **Corporate facility** | Bank Asya | | | | 39.5 | |
| **Total Group D** | | | | | **481.4** | |

[1] Baytur sold before the transaction

DEKABANK copy, March 2013

AlixPartners

# Plan B – Summary

Bank Exposure: By Facility

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 60.0 | 62.1 | 104% | 57.0 | 95% | (5.1) | -9% |
| HSH 2 | 43.0 | 46.1 | 107% | 40.9 | 95% | (5.3) | -12% |
| DVB | 25.0 | 25.3 | 101% | 23.8 | 95% | (1.5) | -6% |
| CB NLB BrLB | 41.0 | 40.5 | 99% | 39.0 | 95% | (1.5) | -4% |
| DVB NLB SAN | 63.0 | 62.1 | 99% | 59.9 | 95% | (2.3) | -4% |
| HSH 1 | 49.0 | 48.5 | 99% | 46.6 | 95% | (2.0) | -4% |
| DVB NLB | 131.0 | 125.2 | 96% | 124.5 | 95% | (0.8) | -1% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 38.5 | 84% | 38.5 | 84% | 0.0 | 0% |
| Natixis 1 | 27.0 | 23.4 | 87% | 23.4 | 87% | 0.0 | 0% |
| Natixis 2 | 16.0 | 14.0 | 88% | 14.0 | 88% | 0.0 | 0% |
| Octavian 2 | 32.0 | 41.0 | 128% | 41.0 | 128% | 0.0 | 0% |
| Octavian 1 | 30.0 | 42.2 | 141% | 42.2 | 141% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon 1 | 47.0 | 67.9 | 145% | 67.9 | 145% | 0.0 | 0% |
| Icon 2 | 38.0 | 59.7 | 157% | 59.7 | 157% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,628.8** | **112%** | **1,609.5** | **110%** | **(19.3)** | **-1%** |

DEKABANK copy. March 6 2012

AlixPartners

DRAFT & PRELIMINARY

# Plan B – Summary

Bank Exposure: By Bank

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 170.1 | 168.8 | 99% | 161.6 | 95% | (7.1) | -4% |
| DVB | 106.3 | 103.4 | 97% | 100.9 | 95% | (2.5) | -2% |
| Commerzbank | 14.8 | 14.6 | 99% | 14.0 | 95% | (0.6) | -4% |
| BrLB | 13.1 | 13.0 | 99% | 12.5 | 95% | (0.5) | -4% |
| Santander | 23.8 | 22.5 | 95% | 22.0 | 93% | (0.6) | -2% |
| HSH | 92.0 | 94.6 | 103% | 87.4 | 95% | (7.2) | -8% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,635.0** | **112%** | **(19.3)** | **-1%** |

DEKABANK copy, March 6 2013

AlixPartners

28



IV. Financial Analysis

DEKABANK copy, March 6 2013

AlixPartners



# Assumptions
General

▸ Business plan is based on the following main assumptions:

## Operations

— 20 offhire days for drydocking
— Rates applied to reflect type of vessel, adjusted for contract terms

— Charter-out options exercised if below market rate
— No Opex inflation
— No working capital movements

## Investments

— Dry docking taken from technical management schedule
— No asset sales
— Capex as per financing commitments

— Charter-in come off upon expiry
— Purchase obligations resold at loss/gain equal to current differential between market value and financial obligation

## Financing

— No variation in current base rate
— Margins as per specific facilities (following pages)
— Amortization as per specific facilities
— No interest rate swap

— Refinancing of Royal providing $27.5m net liquidity post HSH repayment and before any repayment to yard ($10m)
— Extension of Namrun on same terms upon Nov-13 maturity; likely to be sold within 2-3 years

## Restructuring

— No mechanism for bareboat catch-up
— Bareboat purchase options not exercised

— No restructuring fees
— All bank deferrals assumed to take on new profile or bullet repayment (no assumption on bareboat deferrals)

DEKABANK copy, March 6 2013

AlixPartners

DRAFT – PRELIMINARY

## Assumptions
Rates

▸ The Company's market projections  imply CAGR increases of 8-11% for the majority of the fleet:

| $/day | 2013 | 2014 | 2015 | 2016 | 2017 | CAGR (12-17) |
|---|---|---|---|---|---|---|
| Aframax Tanker | 14,000 | 14,000 | 17,500 | 19,000 | 21,000 | 8% |
| Suezmax Tanker | 15,000 | 15,000 | 22,000 | 24,000 | 24,000 | 8% |
| Panamax Tanker | 13,500 | 13,500 | 14,500 | 17,500 | 17,500 | 5% |
| MR Pro/Chem Tanker | 13,000 | 13,000 | 15,000 | 15,000 | 15,000 | 3% |
| Ice Class Pro/Chem Tanker | 12,500 | 12,500 | 14,000 | 14,000 | 14,000 | 3% |
| Capesize Bulk Carrier | 15,000 | 17,500 | 20,000 | 22,000 | 22,000 | 11% |
| Kamsarmax Bulk Carrier | 12,500 | 15,000 | 15,000 | 20,000 | 20,000 | 15% |
| Supramax Bulk Carrier | 10,000 | 11,000 | 15,000 | 17,500 | 17,500 | 17% |
| Mini Bulk Carrier | 5,000 | 6,000 | 7,000 | 8,000 | 8,000 | 15% |

▸ The actual revenue increase accruing to the fleet through the projection differs as a result of the exercise of charter options and the JV structure on certain vessels (mainly Shell). Revenue CAGR through the period is 6.6%



DEKABANK copy March 6 2013

AlixPartners

# Financial Analysis
Summary of Terms: Newco Alpha

| NewCoAlpha #1 | Terms |
|---|---|
| Senior Facilities | - NLB, Uni, DVB NLB, CB NLB BrLB, HSH1, HSH2, DVB NLB SAN, DVB NLB, DVB |
| Amount | - $485.5m ($504.7m outstanding pre-transaction) |
| Interest | - Base Rate: LIBOR<br>- Margin: 300bps w/ potential step-up based on prevalent rates |
| Amortization | - 9-month grace period<br>- Straight line profile based on first 15 years of vessel life<br>- 5 year maturity |
| Covenants | - 95% LTV at close<br>- 85% in Q4 14; 80% in Q4 1S |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts |

| NewCoAlpha #2 | Terms |
|---|---|
| Senior Facilities | - Lloyds |
| Amount | - $104.1m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin: No change (300bps) |
| Amortization | - Current profile<br>- Elimination of cash sweep |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #3 | Terms |
|---|---|
| Senior Facilities | - Natixis |
| Amount | - $37.4m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Scope: 160bps<br>- Margin Namrun: 120bbps<br>- 300bps starting with refinancing of Namrun |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis

Summary of Terms: Newco Alpha

| NewCoAlpha #4 | Terms |
|---|---|
| Senior Facilities | - Credit Europe 1st and 2nd Lien on Royal, Namrun, Scope |
| Amount | - $53.6m ($37.5m 1st plus $16.1m 2nd) |
| Interest | - Base Rate: n/a<br>- Interest Royal 1st Lien : 800bps<br>- Interest 2nd Lien: 1,000bps |
| Amortization | - Current profile |
| Covenants | - 2 year grace and 5 year profile |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #6 | Terms |
|---|---|
| Senior Facilities | - NSF 2nd Lien (behind Unicredit) |
| Amount | - $25.5m (no change) |
| Interest | - Base Rate: n/a<br>- Fixed Margin: 1,150bps |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - 2nd Mortgages with possibility of additional 2nd priority mortgages on entire facilities |
| Other | - n/a |

| NewCoAlpha #5 | Terms |
|---|---|
| Senior Facilities | - Dekabank |
| Amount | - $74.0 (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Tarsus: 245bps<br>- Margin Spot: 185bps<br>- Margin Clear: 245bps |
| Amortization | - Amortisation on a cash/pay-as-you-can basis from vessel earnings |
| Covenants | - Suspended |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts<br>- Coordination agreement prohibiting recourse to the remainder of the group |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

▸ The below tables summarises the features of debt on Newco Alpha



Note: surface area represents percentage share of total facility

AlixPartners

DEKABANK copy. March 6 2013

# Financial Analysis

## Newco Alpha Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 36.0 | 35.5 | 36.2 | 37.2 | 37.9 | 37.5 | 44.7 | 44.8 | 42.9 | 42.7 |
| OPEX | - | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) |
| Drydock | - | (0.4) | (1.0) | (0.5) | - | (0.9) | (0.8) | (0.9) | (1.8) | (0.9) | - |
| **EBITDA** | - | 18.7 | 17.8 | 19.1 | 20.3 | 20.0 | 19.9 | 27.2 | 26.1 | 25.1 | 26.0 |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | 18.7 | 17.8 | 19.1 | 20.3 | 20.0 | 19.9 | 27.2 | 26.1 | 25.1 | 26.0 |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | 74.4 | - | - | - | - | - | - | - | - | - |
| Bank Interest (Senior) | - | (6.9) | (6.9) | (6.8) | (6.8) | (6.6) | (6.4) | (6.2) | (6.0) | (5.9) | (5.7) |
| Bank Principal Repayments [1] | - | - | (4.5) | (4.5) | (15.5) | (18.3) | (18.3) | (19.0) | (19.3) | (19.4) | (19.4) |
| NSF Interest (2nd lien) | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | 66.7 | (12.2) | (12.1) | (23.0) | (25.6) | (25.4) | (26.0) | (26.1) | (26.0) | (25.9) |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases [2] | - | (64.4) | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | (64.4) | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Net cashflow for period** | - | 21.0 | 5.6 | 7.1 | (2.7) | (5.6) | (5.5) | 1.2 | 0.0 | (1.0) | 0.1 |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | - | 20.8 | 26.4 | 33.5 | 30.7 | 25.1 | 19.6 | 20.8 | 20.8 | 19.9 | 20.0 |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Senior Debt Balance* | - | (754.5) | (754.5) | (750.0) | (745.5) | (730.0) | (711.7) | (693.4) | (674.4) | (655.1) | (635.6) |
| *NSF 2nd lien Balance* | - | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) |
| Leverage: (Debt/EBITDA) | 0.00x | 10.44x | 10.96x | 10.13x | 9.49x | 9.44x | 9.26x | 6.60x | 6.70x | 6.79x | 6.36x |
| Hamburg Jumbo Facility LTV | | 95% | 96% | 97% | 98% | 97% | 96% | 95% | 94% | 93% | 92% |
| Hamburg Jumbo Value (depreciated) | | 511.0 | 504.7 | 498.5 | 492.2 | 485.9 | 479.6 | 473.4 | 467.1 | 460.8 | 454.5 |
| Vessels | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |

(1) 9 months principal deferral on the Jumbo facility would be necessary to establish minimum liquidity requirements. Shortfall in absence of this shown above.
(2) Asset purchases net of new financing
(3) Equity cure for 85% covenant in Q4 14 and 80% for Q4 16
(4) Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

AlixPartners

DEKABANK copy. March 6 2013

# Financial Analysis
## Summary of Terms: Newco Beta

▶ The below tables summarises the features of debt on Newco Beta

| NewCo Beta: | Terms |
|---|---|
| Senior Facilities | - CCB, CDB |
| Amount | - $154.3m (no change) |
| Interest | - No change to existing agreements |
| Amortization | - No change to existing agreements |
| Covenants | - No change to existing agreements |
| Security | - No change to existing agreements |
| Other | - n/a |

DEKABANK copy, March 9 2013

AlixPartners

# Financial Analysis
Newco Beta Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 9.3 | 9.2 | 9.4 | 8.8 | 6.4 | 6.4 | 7.2 | 7.4 | 7.4 | 7.3 |
| OPEX | - | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) |
| Drydock | - | - | - | (0.9) | (0.9) | - | - | - | - | - | - |
| **EBITDA** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | - | (1.3) | (1.3) | (1.2) | (1.2) | (1.1) | (1.1) | (1.0) | (1.0) | (1.0) | (0.9) |
| Bank Principal Repayments | - | (6.1) | (6.1) | (6.1) | (6.4) | (6.4) | (6.4) | (6.4) | (6.4) | (3.4) | (3.4) |
| Bareboat Payments | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | (7.4) | (7.4) | (7.3) | (7.6) | (7.6) | (7.5) | (7.4) | (7.4) | (4.4) | (4.4) |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Net cashflow for period** | - | (0.4) | (0.4) | (0.9) | (1.8) | (3.3) | (3.3) | (2.4) | (2.3) | 0.8 | 0.7 |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | - | (0.4) | (0.8) | (1.7) | (3.5) | (6.8) | (10.2) | (12.6) | (14.8) | (14.1) | (13.3) |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Debt Balance* | - | (161.3) | (155.2) | (149.0) | (142.9) | (136.5) | (130.0) | (123.6) | (117.2) | (110.8) | (107.3) |
| *Bareboat balance* | - | - | - | - | - | - | - | - | - | - | - |
| Leverage: (Debt/EBITDA) | 0.00x | 5.69x | 5.54x | 5.82x | 6.20x | 8.06x | 7.77x | 6.13x | 5.69x | 5.37x | 5.27x |
| Loan to value | 0% | 118% | 115% | 111% | 108% | 104% | 100% | 96% | 92% | 88% | 86% |
| Value (depreciated) | 138.0 | 136.7 | 135.4 | 134.1 | 132.8 | 131.4 | 130.1 | 128.8 | 127.5 | 126.2 | 124.9 |
| Vessels | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

[1] Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

DEKABANK copy. March 6 2013

AlixPartners

# Financial Analysis
## Geden Oldco Quarterly Cashflow

| | Q1-13 | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | | |
| Income | 64.9 | 59.0 | 24.3 | 24.3 | 25.5 | 26.3 | 25.9 | 25.6 | 31.6 | 32.3 | 29.0 | 28.8 |
| OPEX | (29.8) | (28.9) | (12.5) | (12.4) | (12.3) | (12.5) | (12.5) | (12.4) | (12.3) | (12.5) | (11.4) | (11.0) |
| Drydock | (0.4) | (0.8) | - | - | (0.5) | - | - | - | - | (0.7) | (1.3) | - |
| **EBITDA** | **34.7** | **29.3** | **11.8** | **11.9** | **12.7** | **13.7** | **13.3** | **13.2** | **19.3** | **19.1** | **16.3** | **17.7** |
| | | | | | | | | | | | | |
| Working capital changes [(1)] | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | **34.7** | **29.3** | **11.8** | **11.9** | **12.7** | **13.7** | **13.3** | **13.2** | **19.3** | **19.1** | **16.3** | **17.7** |
| | | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | (10.6) | (9.8) | - | - | - | - | - | - | - | - | - | - |
| Bank Principal Repayments | (23.8) | (29.9) | (39.5) | - | - | - | - | - | - | - | - | - |
| Bareboat Payments | (17.8) | (19.8) | (20.8) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| Pre-Del Drawdown | 45.0 | 8.5 | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | 119.3 | 25.3 | 25.3 | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | (57.9) | (12.2) | (13.2) | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | **54.0** | **(38.0)** | **(48.2)** | **(20.8)** | **(20.4)** | **(20.6)** | **(20.7)** | **(20.7)** | **(20.3)** | **(20.5)** | **(18.6)** | **(18.6)** |
| | | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | | |
| Capex | (82.7) | (42.3) | - | - | - | - | - | - | - | - | [(2)] | - |
| Asset Sale net proceeds | - | 5.5 | 44.6 | - | - | - | - | - | - | - | (23.9) | - |
| **Net Investment** | **(82.7)** | **(36.8)** | **44.6** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(23.9)** | **-** |
| | | | | | | | | | | | | |
| **Net cashflow for period** | **6.0** | **(45.5)** | **8.2** | **(8.9)** | **(7.7)** | **(6.9)** | **(7.4)** | **(7.6)** | **(0.9)** | **(1.4)** | **(26.2)** | **(0.8)** |
| | | | | | | | | | | | | |
| **Cumulative net cash balance** | **41.0** | **(4.5)** | **3.7** | **(5.3)** | **(12.9)** | **(19.8)** | **(27.2)** | **(34.8)** | **(35.7)** | **(37.1)** | **(63.4)** | **(64.2)** |
| | | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | | |
| *Debt Balance* | *(1,109.5)* | *(1,064.2)* | - | - | - | - | - | - | - | - | - | - |
| *Bareboat balance* | *(471.3)* | *(453.4)* | *(433.7)* | *(412.8)* | *(392.0)* | *(371.7)* | *(351.1)* | *(330.3)* | *(309.6)* | *(289.3)* | *(268.8)* | *(250.3)* |
| Vessels | 56 | 55 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 20 | 20 |

[(1)] Working Capital change reflects paydown of corporate facility with cash from sale transaction; $10m oustanding to Rongsheng is left unpaid
[(2)] Purchase obligations on sale leasebacks assumed to generate cash loss equivalent to deficiency between current outstanding obligation and market value

AlixPartners

DEKABANK copy, March - 2013



V. Conclusions

DEKABANK copy, March 6 2013

39

AlixPartners

# Current Proposal
## Strategy and Objectives

▸   The solution provides, directly or indirectly, for the primary objectives held by the different stakeholders.

| Objective | Comments |
|---|---|
| 1. Compensate stakeholders adequately for their risk-weighted capital exposure and concessions | • Assets with similar risk profile pooled together provides for better aligned incentives<br>• Lenders provided with adequate equity cushion, margins, and covenants<br>• Provides for recategorization of exposure from "Geden Holdings Ltd" to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support |
| 2. Constrain formal or informal cross subsidization between stakeholders related to different underlying assets | • While it reduces the portfolio effect of a broader fleet, combining similar assets together limits risk of cross subsidies going from high to low collateral vessels<br>• Pooling through creation of unique syndicate facility would facilitate granting of a second priority mortgage through the fleet as well as increase liquidity of bank assets, enabling lenders to sell out of assets without disrupting operations |
| 3. Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests) | • Common set of incentives and exposure to recovery protects lenders from disruptive behaviour onset by other stakeholders with a markedly different position<br>• Sister-ship arrest risk minimized given shareholding structure in Newco |
| 4. Maximize options for stakeholders and potential for self-selection | • Rebasing of assets can provide mechanism for transfer from one Newco profile to another (ie. Group C and D into A)<br>• Opting out of the scheme can be achieved via mutually agreed terms for redelivery of vessel to relevant lender |

DEKABANK copy  March 6 2013

AlixPartners



# Contents

A.     Facility Description
B.     Financials: Existing
C.     Market Overview

DEKABANK copy, March 6 2013

41

AlixPartners

DRAFT & PRELIMINARY

# Appendix
Facility Description

| Facility | HSH1 | HSH2 | Natixis1 | Natixis2 | Icon1 | Icon2 | Octavian1 | Octavian2 |
|---|---|---|---|---|---|---|---|---|
| Debt / Bareboat | Debt | Debt | Debt | Debt | Bareboat | Bareboat | Bareboat | Bareboat |
| Vessels | Hero | Citron / Citrus | Scope | Namrun | Center | Fantasic / Amazing | Enjoy | Marka |
| Lender group | HSH | HSH | Natixis | Natixis | Icon [DVB] | Icon [DVB NLB] | Octavian [DVB] | Octavian [NLB] |

AlixPartners

# Appendix: Transaction Analysis
Newco Beta Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Existing debt rollover | 154.3 | Purchase at outstanding debt level | 154.3 |
| **Total Sources** | **$154.3** | **Total Uses** | **$154.3** |

Additional liquidity to maintain operational cash balance not shown; Estimated at $20m and could be financed via equity of deferrals

DEKABANK copy, March 6 2013

AlixPartners

# Appendix: Transaction Analysis
Residual Oldco Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Alpha Sale Receipts | 828.6 | Alpha Vessels Debt Repayment | 780.0 |
| Beta Sale Receipts | 154.3 | Beta Vessels Debt Repayment | 154.3 |
| Baytur Sale Receipts | 13.6 | Baytur Debt Repayment | 8.4 |
| Group C Sale Receipts | 258.8 | Group C Repayment | 258.8 |
| | | Change in Working Capital (Repayment of A/P) & corp. facility | 53.8 |
| **Total Sources** | **$1,255.3** | **Total Uses** | **$1,255.3** |

DEKABANK copy, March 8 2013

AlixPartners



## Assumptions
Revenue





DEKABANK copy March 6 2013

AlixPartners



## Assumptions
Revenue





AlixPartners

# Appendix: Additional Financial Analysis

Newco Alpha Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 71.5 | 148.8 | 175.2 | 181.3 | 186.7 |
| OPEX | (33.7) | (67.2) | (67.2) | (67.3) | (67.2) |
| Drydock | (1.4) | (2.3) | (3.6) | (6.3) | (2.3) |
| **EBITDA** | 36.5 | 79.3 | 104.4 | 107.7 | 117.2 |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | 36.5 | 79.3 | 104.4 | 107.7 | 117.2 |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | 74.4 | - | - | - | - |
| Bank Interest (Senior) | (13.8) | (26.7) | (23.8) | (20.8) | (17.6) |
| Bank Principal Repayments | (4.7) | (56.6) | (77.2) | (79.1) | (78.2) |
| NSF Interest (2nd lien) | (1.5) | (2.9) | (2.9) | (2.9) | (2.9) |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | 54.4 | (86.2) | (104.0) | (102.7) | (98.8) |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | (64.4) | - | - | - | - |
| **Net Investment** | (64.4) | - | - | - | - |
| | | | | | |
| **Net cashflow for period** | 26.4 | (6.8) | 0.4 | 4.9 | 18.4 |
| | | | | | |
| **Cumulative net cash balance** | 26.4 | 19.6 | 20.0 | 24.9 | 43.3 |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Senior Debt Balance* | (754.5) | (749.8) | (693.2) | (616.0) | (536.9) |
| *NSF 2nd lien Balance* | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) |
| Leverage: (Debt/EBITDA) | 21.40x | 9.77x | 6.88x | 5.96x | 4.80x |
| Hamburg Jumbo Facility LTV | 95% | 97% | 95% | 91% | 86% |
| Value (depreciated) | 511.0 | 498.5 | 473.4 | 448.3 | 423.2 |
| Vessels | 29 | 29 | 29 | 29 | 29 |

DEKABANK Copy, March 8 2013

AlixPartners

# Appendix: Additional Financial Analysis

Newco Beta Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 18.5 | 31.0 | 29.2 | 31.3 | 32.1 |
| OPEX | (4.4) | (8.8) | (8.8) | (8.8) | (8.8) |
| Drydock | - | (1.7) | - | (1.3) | - |
| **EBITDA** | **14.1** | **20.6** | **20.4** | **21.3** | **23.4** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **14.1** | **20.6** | **20.4** | **21.3** | **23.4** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (2.6) | (4.6) | (3.9) | (3.3) | (2.7) |
| Bank Principal Repayments | (12.3) | (25.4) | (19.7) | (20.2) | (20.2) |
| Bareboat Payments | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **(14.8)** | **(30.0)** | **(23.6)** | **(23.5)** | **(22.8)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - |
| | | | | | |
| **Net cashflow for period** | **(0.8)** | **(9.4)** | **(3.2)** | **(2.2)** | **0.5** |
| | | | | | |
| **Cumulative net cash balance** | **(0.8)** | **(10.2)** | **(13.3)** | **(15.6)** | **(15.0)** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | *(161.3)* | *(149.0)* | *(123.6)* | *(103.9)* | *(83.8)* |
| *Bareboat balance* | | | | | |
| Leverage: (Debt/EBITDA) | 11.45x | 7.24x | 6.05x | 4.89x | 3.59x |
| Loan to value | 117% | 112% | 97% | 85% | 72% |
| Value (depreciated) | 138.0 | 132.8 | 127.5 | 122.3 | 117.0 |
| Vessels | 4 | 4 | 4 | 4 | 4 |

DEKABANK conf., March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis

Residual Oldco Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 172.5 | 103.2 | 121.6 | 121.3 | 105.5 |
| OPEX | (83.7) | (49.7) | (47.2) | (39.6) | (33.6) |
| Drydock | (1.2) | (0.5) | (2.0) | (1.9) | (2.3) |
| **EBITDA** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (20.5) | - | - | - | - |
| Bank Principal Repayments | (93.2) | - | - | - | - |
| Bareboat Payments | (79.2) | (82.4) | (77.9) | (64.0) | (49.6) |
| Pre-Del Drawdown | 53.4 | - | - | - | - |
| Bareboat Drawdowns | 169.8 | - | - | - | - |
| Pre-Del Repayments | (83.3) | - | - | - | - |
| **Net Financing Cashflow** | **(53.0)** | **(82.4)** | **(77.9)** | **(64.0)** | **(49.6)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | (125.0) | - | - | - | - |
| Asset Sale net proceeds | 50.1 | - | (23.9) | (37.2) | (24.1) |
| **Net Investment** | **(75.0)** | **-** | **(23.9)** | **(37.2)** | **(24.1)** |
| | | | | | |
| **Net cashflow for period** | **(40.3)** | **(29.5)** | **(29.4)** | **(21.5)** | **(4.2)** |
| | | | | | |
| **Cumulative net cash balance** | **(5.3)** | **(34.8)** | **(64.2)** | **(85.7)** | **(89.9)** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | (1,109.5) | - | - | - | - |
| *Bareboat balance* | (471.3) | (392.0) | (309.6) | (231.7) | (167.7) |
| Vessels | 56 | 22 | 20 | 17 | 14 |

DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRELIMINARY

# Appendix

Bank Exposure: Hamburg reduced to 90% LTV

▸ Equity required if LTV improved to 90% is $90.0m ($25.6m more than at an LTV of 95%)

| | Estimated Value | Current debt | LTV Before | New Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 89.1 | 90% | (5.8) | -6% |
| NLB | 170.1 | 168.8 | 99% | 153.1 | 90% | (15.7) | -9% |
| DVB | 106.3 | 103.4 | 97% | 95.6 | 90% | (7.8) | -7% |
| Commerzbank | 14.8 | 14.6 | 99% | 13.3 | 90% | (1.3) | -9% |
| BrLB | 13.1 | 13.0 | 99% | 11.8 | 90% | (1.1) | -9% |
| Santander | 23.8 | 22.5 | 95% | 21.2 | 89% | (1.4) | -6% |
| HSH | 92.0 | 94.6 | 103% | 82.8 | 90% | (11.8) | -13% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,609.4** | **110%** | **(44.8)** | **-3%** |

DEKABANK copy, March 2013

AlixPartners

DRAFT & PRELIMINARY

# Appendix
Potential loss on bareboat purchase obligations

▸ There exist a number of obligations to purchase at future dates under the following bareboat agreements. The cashflows reflect the following losses occurring via purchase and resale at the obligation date. It assumes no changes to market values but applies depreciation to current estimated values over the time until the purchase and resale date. If the vessels were retained rather than crystallize the loss, then there would be a greater cash outflow for refinancing plus further ongoing loss on vessels were these occur.

|  | Purchase obligation ($m) | Estimated value today ($m) | Loss on resale | Depreciated value ($m) | Loss on resale | Purchase OB Date | Years | Monthly depreciation |
|---|---|---|---|---|---|---|---|---|
| Avor | 51.5 | 31 | -20.5 | 27.6 | -23.9 | Aug-15 | 2.6 | 0.11 |
| Enjoy | 38.5 | 30 | -8.5 | 25.5 | -13.0 | Apr-16 | 3.2 | 0.11 |
| Centre | 64.5 | 47 | -17.5 | 40.2 | -24.3 | Jun-16 | 3.4 | 0.17 |
| Marka | 37 | 32 | -5 | 26.0 | -11.0 | Apr-17 | 4.2 | 0.12 |
| Fantastic | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| Amazing | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| **TOTAL** | **234.5** | **178** | **-56.5** | **149.2** | **-85.3** | | | |

DEKABANK copy. March 6 2013

AlixPartners

# Global Locations

AlixPartners is ready to field a team of relevant experts whenever and wherever they are needed. Our professionals work from 15 global offices in more than a dozen different countries. They speak more than 50 languages, and have experience in every corner of the world. Call us, we'll be there when it really matters.

**Chicago**
300 N. LaSalle Street
Suite 1900
Chicago, IL 60654
312.346.2500

**Dallas**
2101 Cedar Springs Road
Suite 1100
Dallas, TX 75201
214.647.7500

**Detroit**
2000 Town Center
Suite 2400
Southfield, MI 48075
248. 358.4420

**Dubai**
Gate Village 10, Level 03
P.O. Box 125115
Dubai Intl Financial Centre
Dubai, United Arab Emirates
+971.4.401.9246

**Düsseldorf**
Königsallee 59 a
40215 Düsseldorf
Germany
+49.211.97.55.10.00

**London**
20 North Audley Street
London W1K 6WE
United Kingdom
+44.20.7098.7400

**Los Angeles**
515 S. Flower Street
Suite 3050
Los Angeles, CA 90071
213.437.7100

**Milan**
Corso Matteotti 9
20121 Milan
Italy
+39.02.360.12000

**Munich**
Mauerkircherstr. 1 a
81679 München
Germany
+49.89.20.30.40.00

**New York**
40 West 57th Street
New York, NY 10019
212.490.2500

**Paris**
49/51 Avenue George V
75008 Paris
France
+33.1.76.74.72.00

**San Francisco**
4 Embarcadero Center
31st Floor, Suite 3110
San Francisco, CA 94111
415.848.0283

**Shanghai**
Suite 6111
Plaza 66 Building I
1266 Nan Jing West Road
Shanghai, 200040 China
+8621.6171.7555

**Tokyo**
Marunouchi Building 33F
2-4-1 Marunouchi
Chiyoda-ku
Tokyo 100-6333 Japan
+81.3.5533.4800

**Washington, DC**
1602 L Street, NW
Suite 300
Washington, DC 20036
202.756.9000

© AlixPartners, LLP, 2010

AlixPartners

DEKABANK copy, March 8 2013

# ANNEX 3

**2nd original**

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon A" and "Barecon B". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen. Issued November 2001

| 1. Shipbroker | BIMCO STANDARD BAREBOAT CHARTER |
|---|---|
| **Arrow Tankers A/S** | **CODE NAME: "BARECON 2001"** PART I |
| **Bredgade 31 B, 4.** | |
| **DK-1260 Copenhagen K** | 2. Place and date |
| **Denmark** | **Copenhagen, 23rd February 2010** |

| 3. Owners/Place of business (Cl. 1) | 4. Bareboat Charterers/Place of business (Cl. 1) |
|---|---|
| **Psara Energy Limited** | **Geden Holdings Limited, Malta or nominee always guaranteed by** |
| **Ajeltake Road, Ajeltake Island** | **Geden Line. Performance Guarantee to the satisfaction of Owners** |
| **Majuro, MH 96960** | **and their financiers to be mutually agreed.** |
| **Marshall Island** | |

| 5. Vessel's name, call sign and flag (Cl. 1 and 3) | |
|---|---|
| **Name: m.t. CV STEALTH** | |
| **Flag: Malta** | |

| 6. Type of Vessel | 7. GT/NT |
|---|---|
| **Crude oil carrier** | **58,418 / 31,117** |

| 8. When/Where built | 9. Total DWT (abt.) in metric tons on summer freeboard |
|---|---|
| **2005 / Shanghai Wangaoqiao Shipbuilding Co. Ltd.** | **104,499** |

| 10. Classification Society (Cl. 3) | 11. Date of last special survey by the Vessel's classification society |
|---|---|
| **ABS** | **N/A** |

12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)

**Attached Vessel's Q88. Vessel to be redeliverd with SS passed**

| 13. Port or Place of delivery (Cl. 3) | 14. Time for delivery (Cl. 4) | 15. Cancelling date (Cl. 5) |
|---|---|---|
| **WW DLOSP at one safe port / safe anchorage ATDNSHINC** | **15th April 2010, 00:01 hrs lt** | **30th August 2010, 23:59 hrs lt** |
| **Vessel to be delivered with SS passed** | | |

| 16. Port or Place of redelivery (Cl. 15) | 17. No. of months' validity of trading and class certificates |
|---|---|
| **DLOSP at one safe port, berth or anchorage WW in CHOPT always** | upon redelivery (Cl. 15) |
| **within trading limits ATDNSHINC** | **SS/DD passed without extensions** |

| 18. Running days' notice if other than stated in Cl. 4 | 19. Frequency of dry-docking (Cl. 10(g)) |
|---|---|
| **See Rider Clause 15.** | **As required by class without extensions** |

20. Trading limits (Cl. 6)

**Worldwide, excluding Israel, Cambodia, Cuba, Lebanon, Gulf of Aqaba, Namibia, North Korea, Chinese River Ports, Haiti, all war risk and war like zones and other areas/countries prohibited by the flag of the vessel and the United Nations without Owners' prior consent which shall not be unreasonably withheld.**

**The vessel not to trade in ice, break ice nor follow ice breakers in ice.**

| 21. Charter period (Cl. 2) | 22. Charter hire (Cl. 11) |
|---|---|
| **5 years straight period +/- 30 days in Charterer's option plus 1 or 2** | **USD 9,750 gross pdpr the first 365 days after delivery** |
| **years optional year(s) declaration by Charterers 5 months prior** | **USD 10,750 gross pdpr for the 2nd charter year** |
| **end of the firm period** | **USD 11,750 gross pdpr for the period starting from 730th day after** |
| | **delivery until end of 3rd year** |
| | **USD 10,750 gross pdpr for 4th charter year** |
| | **USD 10,750 gross pdpr for 5th charter year** |
| | **USD 13,250 for the optional period** |

23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))

**10%**

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**"BARECON 2001" STANDARD BAREBOAT CHARTER**

PART I

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to <u>PART IV</u><br><br>**As per Clause 10 F** | 25. Currency and method of payment (<u>Cl. 11</u>)<br><br>**US Dollars / Telegraphic Transfer** |
| 26. Place of payment; also state beneficiary and bank account (<u>Cl. 11</u>)<br><br>**TBA** | 27. Bank guarantee/bond (sum and place) (<u>Cl. 24</u>) (optional)<br><br>**Corporate Guarantee to be attached to the BBCHP as attached to the C/P** |
| 28. Mortgage(s), if any (state whether <u>12(a)</u> or <u>(b)</u> applies; if <u>12(b)</u> applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (<u>Cl. 12</u>) | 29. Insurance (hull and machinery and war risks) (state value acc. to <u>Cl. 13(f)</u> or, if applicable, acc. to <u>Cl. 14(k)</u>) (also state if <u>Cl. 14</u> applies)<br><br>**USD 77,000,000** |
| 30. Additional insurance cover, if any, for Owners' account limited to (<u>Cl. 13(b)</u> or, if applicable, <u>Cl. 14(g)</u>)<br><br>**At Owner's discretion** | 31. Additional insurance cover, if any, for Charterers' account limited to (<u>Cl. 13(b)</u> or, if applicable, <u>Cl. 14(g)</u>)<br><br>**At Charterer's discretion** |
| 32. Latent defects (only to be filled in if period other than stated in <u>Cl. 3</u>)<br>**N/A** | 33. Brokerage commission and to whom payable (<u>Cl. 27</u>)<br>**1% to Arrow Tankers A/S payable by the Owners** |
| 34. Grace period (state number of clear banking days) (<u>Cl. 28</u>)<br><br>**Seven (7) working days** | 35. Dispute Resolution (state <u>30(a)</u>, <u>30(b)</u> or <u>30(c)</u>; if <u>30(c)</u> agreed Place of Arbitration <u>must</u> be stated acc. to <u>Cl. 30</u>)<br><br>**30a** |
| 36. War cancellation (indicate countries agreed) (<u>Cl. 26(f)</u>)<br><br>**UK, USA, Russia, China** | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether <u>PART III</u> applies) (optional)<br><br>**N/A** | 38. Name and place of Builders (only to be filled in if <u>PART III</u> applies)<br>**N/A** |
| 39. Vessel's Yard Building No. (only to be filled in if <u>PART III</u> applies)<br>**N/A** | 40. Date of Building Contract (only to be filled in if <u>PART III</u> applies)<br>**N/A** |
| 41. Liquidated damages and costs shall accrue to (state party acc. to <u>Cl. 1</u>)<br>  a)  **N/A**<br>  b)  **N/A**<br>  c)  **N/A** | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether <u>PART IV</u> applies) (optional)<br>**As per Rider Clause 13** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether <u>PART V</u> applies) (optional)<br>**No** |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if <u>PART V</u> applies)<br>**N/A** | 45. Country of the Underlying Registry (only to be filled in if <u>PART V</u> applies)<br>**N/A** |
| 46. Number of additional clauses covering special provisions, if agreed<br><br>**Rider Clauses 1-20** | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include <u>PART I</u> and <u>PART II</u>. In the event of a conflict of conditions, the provisions of <u>PART I</u> shall prevail over those of <u>PART II</u> to the extent of such conflict but no further. It is further mutually agreed that <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> shall only apply and only form part of this Charter if expressly agreed and stated in <u>Boxes 37</u>, <u>42</u> and <u>43</u>. If <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> to the extent of such conflict but no further.

| | |
|---|---|
| Signature (Owners) | Signature (Charterers) |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**"BARECON 2001" STANDARD BAREBOAT CHARTER**

2nd original
PART I

This document is a computer generated BARECON 2001 form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "BARECON 2001" Standard Bareboat Charter

**1.    Definitions** (1)
In this Charter, the following terms shall have the (2)
meanings hereby assigned to them: (3)
*"The Owners"* shall mean the party identified in <u>Box 3</u>; (4)
*"The Charterers"* shall mean the party identified in <u>Box 4</u>; (5)
*"The Vessel"* shall mean the vessel named in <u>Box 5</u> and (6)
with particulars as stated in <u>Boxes 6</u> to <u>12</u>. (7)
*"Financial Instrument"* means the mortgage, deed of (8)
covenant or other such financial security instrument as (9)
annexed to this Charter and stated in <u>Box 28</u>. (10)

**2.    Charter Period** (11)
In consideration of the hire detailed in <u>Box 22</u>, (12)
the Owners have agreed to let and the Charterers have (13)
agreed to hire the Vessel for the period stated in <u>Box 21</u> (14)
("The Charter Period"). (15)

**3.    Delivery** (16)
*(not applicable when Part III applies, as indicated in <u>Box 37</u>)* (17)
**(a)**    The Owners shall before and at the time of delivery (18)
exercise due diligence to make the Vessel seaworthy (19)
And in every respect ready in hull, machinery and (20)
equipment for service under this Charter. (21)
The Vessel shall be delivered by the Owners and taken (22)
over by the Charterers at the port or place indicated in (23)
<u>Box 13</u> in such ready safe berth as the Charterers may (24)
direct. (25)
**(b)**    The Vessel shall be properly documented on (26)
delivery in accordance with the laws of the flag State (27)
indicated in <u>Box 5</u> and the requirements of the (28)
classification society stated in <u>Box 10</u>. The Vessel upon (29)
delivery shall have her survey cycles up to date and (30)
trading and class certificates valid for at least the number (31)
of months agreed in <u>Box 12</u>. (32)
**(c)**    The delivery of the Vessel by the Owners and the (33)
taking over of the Vessel by the Charterers shall (34)
constitute a full performance by the Owners of all the (35)
Owners' obligations under this <u>Clause 3</u>, and thereafter (36)
the Charterers shall not be entitled to make or assert (37)
any claim against the Owners on account of any (38)
conditions, representations or warranties expressed or (39)
implied with respect to the Vessel but the Owners shall (40)
be liable for the cost of but not the time for repairs or (41)
renewals occasioned by latent defects in the Vessel, (42)
her machinery or appurtenances, existing at the time of (43)
delivery under this Charter, provided such defects have (44)
manifested themselves within twelve (12) months after (45)
delivery unless otherwise provided in <u>Box 32</u>. (46)

**4.    Time for Delivery** (47)
*(not applicable when Part III applies, as indicated in <u>Box 37</u>)* (48)
The Vessel shall not be delivered before the date (49)
indicated in <u>Box 14</u> without the Charterers' consent and (50)
the Owners shall exercise due diligence to deliver the (51)
Vessel not later than the date indicated in <u>Box 15</u> as per (52)
**Box 18.** (53)
~~Unless otherwise agreed in Box 18, the Owners shall~~ (54)
~~give the Charterers not less than thirty (30) running days'~~ (55)
~~preliminary and not less than fourteen (14) running days'~~ (56)
~~definite notice of the date on which the Vessel is~~ (57)
~~expected to be ready for delivery.~~ (57)
The Owners shall keep the Charterers closely advised (58)
of possible changes in the Vessel's position. (59)

**5.    Cancelling** (60)
*(not applicable when Part III applies, as indicated in <u>Box 37</u>)* (61)
**(a)**    Should the Vessel not be delivered latest by the (62)
cancelling date indicated in <u>Box 15</u>, the Charterers shall (63)
have the option of cancelling this Charter by giving the (64)
Owners notice of cancellation within thirty-six (36) (65)
running hours after the cancelling date stated in Box (66)
15, failing which this Charter shall remain in full force (67)
and effect. (68)
**(b)**    If it appears that the Vessel will be delayed beyond (69)
the cancelling date, the Owners may, as soon as they (70)
are in a position to state with reasonable certainty the (71)

day on which the Vessel should be ready, give notice (72)
thereof to the Charterers asking whether they will (73)
exercise their option of cancelling, and the option must (74)
then be declared within one hundred and sixty-eight (75)
(168) running hours of the receipt by the Charterers of (76)
such notice or within thirty-six (36) running hours after (77)
the cancelling date, whichever is the earlier. If the (78)
Charterers do not then exercise their option of cancelling, (79)
the seventh day after the readiness date stated in the (80)
Owners' notice shall be substituted for the cancelling (81)
date indicated in <u>Box 15</u> for the purpose of this <u>Clause 5</u>. (82)
**(c)**    Cancellation under this <u>Clause 5</u> shall be without (83)
prejudice to any claim the Charterers may otherwise (84)
have on the Owners under this Charter. (85)

**6.    Trading Restrictions** (86)
The Vessel shall be employed in lawful trades for the (87)
carriage of suitable lawful merchandise within the trading (88)
limits indicated in <u>Box 20</u>. (89)
The Charterers undertake not to employ the Vessel or (90)
suffer the Vessel to be employed otherwise than in (91)
conformity with the terms of the contracts of insurance (92)
(including any warranties expressed or implied therein) (93)
without first obtaining the consent of the insurers to such (94)
employment and complying with such requirements as (95)
to extra premium or otherwise as the insurers may (96)
prescribe. **When required by Owner, the Charterers** (97)
**shall keep the Owners and Mortgages advised on**
**intended employment of Vessel.**
The Charterers also undertake not to employ the Vessel (98)
or suffer her employment in any trade or business which (99)
is forbidden by the law of any country to which the Vessel (100)
may sail or is otherwise illicit or in carrying illicit or (101)
prohibited goods or in any manner whatsoever which (102)
may render her liable to condemnation, destruction, (103)
seizure or confiscation. (104)
Notwithstanding any other provisions contained in this (105)
Charter it is agreed that nuclear fuels or radioactive (106)
products or waste are specifically excluded from the (107)
cargo permitted to be loaded or carried under this (108)
Charter. This exclusion does not apply to radio-isotopes (109)
used or intended to be used for any industrial, (110)
commercial, agricultural, medical or scientific purposes (111)
provided the Owners' prior approval has been obtained (112)
to loading thereof. (113)

**7.    Surveys on Delivery and Redelivery** (114)
*(not applicable when Part III applies, as indicated in <u>Box 37</u>)* (115)
The Owners and Charterers shall each appoint (116)
surveyors for the purpose of determining and agreeing (117)
in writing the condition of the Vessel at the time of (118)
delivery and redelivery hereunder. The Owners shall (119)
bear all expenses of the On-hire Survey including loss (120)
of time, if any, and the Charterers shall bear all expenses (121)
of the Off-hire Survey including loss of time, if any, at (122)
the daily equivalent to the rate of hire or pro rata thereof. (123)

**8.    Inspection** (124)
The Owners shall have the right at any time after giving (125)
reasonable notice to the Charterers to inspect or survey (126)
the Vessel or instruct a duly authorised surveyor to carry (127)
out such survey on their behalf:- **provided it does not** (128)
**interfere with the operation of the Vessel a/o crew,**
**but not to  be unrasonably withheld.**
**(a)**    to ascertain the condition of the Vessel and satisfy (129)
themselves that the Vessel is being properly repaired (130)
and maintained. The costs and fees for such inspection (131)
or survey shall be paid by the Owners unless the Vessel (132)
is found to require repairs or maintenance in order to (133)
achieve the condition so provided; (134)
**(b)**    in dry-dock if the Charterers have not dry-docked (135)
Her in accordance with <u>Clause 10(g)</u>. The costs and fees (136)
for such inspection or survey shall be paid by the (137)
Charterers; and (138)
**(c)**    for any other commercial reason they consider (139)
necessary (provided it does not unduly interfere with (140)

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BiMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

the commercial operation of the Vessel). The costs and fees for such inspection and survey shall be paid by the Owners. (141–143)

All time used in respect of inspection, survey or repairs shall be for the Charterers' account and form part of the Charter Period. (144–146)

The Charterers shall also permit the Owners to inspect the Vessel's log books whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel. (147–151)

**9. Inventories, Oil and Stores** (152)
A complete inventory of the Vessel's entire equipment, outfit including spare parts, appliances and of all consumable stores on board the Vessel shall be made by the Charterers in conjunction with the Owners on delivery and again on redelivery of the Vessel. The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the said Vessel at the then current market prices at the ports of delivery and redelivery, respectively. The Charterers shall ensure that all spare parts listed in the inventory and used during the Charter Period are replaced at their expense prior to redelivery of the Vessel. (153–167)

**10. Maintenance and Operation** (168)
**(a)(i)** Maintenance and Repairs - During the Charter Period the Vessel shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and, except as provided for in Clause 14(l), if applicable, at their own expense they shall at all times keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times. If necessary as deemed by class, the Charterers to take immediate steps to have the necessary repairs done within a reasonable time (prior to or upon SS-drydocking) failing which the Owners shall have the right of withdrawing the Vessel from the service of the Charterers and without prejudice to any claim the Owners may otherwise have against the Charterers under this Charter. (169–182)

**(ii)** New Class and Other Safety Requirements - In the event of any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation costing (excluding the Charterers' loss of time) more than the percentage stated in Box 23, or if Box 23 is left blank, 5 per cent. of the Vessel's insurance value as stated in Box 29, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the Owners and the Charterers in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under this Charter shall, in the absence of agreement, be referred to the dispute resolution method agreed in Clause 30. (183–200)

**(iii)** Financial Security - The Charterers shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or municipal or other division (201–204)

or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so. (205–218)

**(b)** Operation of the Vessel - The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and, whenever required, repair the Vessel during the Charter Period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including annual flag State fees and any foreign general municipality and/or state taxes. The Master, officers and crew of the Vessel shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners. Charterers shall comply with the regulations regarding officers and crew in force in the country of the Vessel's flag or any other applicable law. (219–233)

**(c)** The Charterers shall keep the Owners and the mortgagee(s) advised of the intended employment, planned dry-docking and major repairs of the Vessel, as reasonably required. (234–237)

**(d)** Flag and Name of Vessel – Charterers have the right to reflag the ship and install and display their funnel insignia and fly their own house flag, but name cannot be changed. ~~During the Charter Period, the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. The Charterers shall also have the liberty, with the Owners' consent, which shall not be unreasonably withheld, to change the flag and/or the name of the Vessel during the Charter Period. Painting and re-painting, instalment and re-instalment, registration and re-registration, if required by the Owners, shall be at the Charterers' expense and time.~~ (238–248)

**(e)** Changes to the Vessel - Subject to Clause 10(a)(ii), the Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof. If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition before the termination of this Charter. (249–256)

**(f)** Use of the Vessel's Outfit, Equipment and Appliances - The Charterers shall have the use of all outfit, equipment, and appliances on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted. The Charterers shall from time to time during the Charter Period replace such items of equipment as shall be so damaged or worn as to be unfit for use. The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the period if requested by the Owners. Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the (257–276)

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# PART II
## "BARECON 2001" Standard Bareboat Charter

Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations. 277–282

**(g)** Periodical Dry-Docking - The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once during the period stated in Box 19 or, if Box 19 has been left blank, every sixty (60) calendar months after delivery or such other period as may be required by the Classification Society or flag State. 283–289

**11. Hire** 290

**(a)** The Charterers shall pay  hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence. 291–293

**(b)** Payment of hire shall be made as per daily hire in Box 22 basis per calender month in advance. First hire payable prorata upto end of the month starting from vessel's actual delivery date/time. ~~The Charterers shall pay to the Owners for the hire~~ 294

~~of the Vessel a lump-sum in the amount indicated in Box 22 which shall be payable not later than every thirty (30) running days in advance, the first lump sum being payable on the date and hour of the Vessel's delivery to the Charterers. Hire shall be paid continuously throughout the Charter Period.~~ 295–300

**(c)** Payment of hire shall be made in cash without discount in the currency and in the manner indicated in Box 25 and at the place mentioned in Box 26. 301–303

**(d)** Final payment of hire, if for a period of less than ~~thirty (30) running days~~ a month, shall be calculated proportionally 304–305

according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly. 306–308

**(e)** Should the Vessel be lost or missing, hire shall cease from the date and time when she was lost or last heard of. ~~The date upon which the Vessel is to be treated as lost or missing shall be ten (10) days after the Vessel was last reported or when the Vessel is posted as missing by Lloyd's, whichever occurs first.  Any hire paid in advance to be adjusted accordingly.~~ 309–315

**(f)** Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24. If Box 24 has not been filled in, the three months Interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent., shall apply. 316–322

**(g)** Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date. 323–327

**12. Mortgage** 328

(only to apply if Box 28 has been appropriately filled in) 329

*) ~~(a)   The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~ 330–333

*) **(b)** The Vessel chartered under this Charter is financed by a mortgage according to the Financial Instrument. The Charterers undertake to comply, and provide such information and documents to enable the Owners to comply, with all such instructions or directions in regard to the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Financial Instrument or as may be directed from time to time during the currency of the Charter by the mortgagee(s) in conformity with the Financial Instrument. The Charterers confirm that, for this purpose, they have acquainted 334–344

themselves with all relevant terms, conditions and provisions of the Financial Instrument and agree to acknowledge this in writing in any form that may be required by the mortgagee(s). The Owners warrant that they have not effected any mortgage(s) other than stated in Box 28 and that they shall not agree to any ~~amendment to the mortgage(s) referred to in Box 28 or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~ 345–354

*) (Optional, Clauses 12(a) and 12(b) are alternatives; indicate alternative agreed in Box 28). 355–356

**13. Insurance and Repairs** 357

**(a)** During the Charter Period the Vessel be kept insured by the Charterers at their expense against hull and machinery, war and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve, which approval shall not be un-reasonably withheld. Such insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and the mortgagee(s) (if any), and The Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint. Insurance policies shall cover the Owners and the Charterers according to their respective interests. Subject to the provisions of the Financial Instrument, if any, and the approval of the Owners and the insurers, the Charterers shall effect all insured repairs and shall undertake settlement and reimbursement from the insurers of all costs in connection with such repairs as well as insured charges, expenses and liabilities to the extent of coverage under the insurances herein provided for. 358–380

The Charterers also to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances. 381–386

All time used for repairs under the provisions of sub-clause 13(a) and for repairs of latent defects according to Clause 3(c) above, including any deviation, shall be for the Charterers' account. 387–390

**(b)** If the conditions of the above insurances permit additional insurance to be placed by the parties, such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary. 391–400

**(c)** The Charterers shall upon the request of the Owners, provide information and promptly execute such documents as may be required to enable the Owners to comply with the insurance provisions of the Financial Instrument. 401–405

**(d)** Subject to the provisions of the Financial Instrument, if any, should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 13(a), all insurance payments for such loss shall be paid to the Owners who shall distribute the moneys between the Owners and the Charterers according to their respective interests. The Charterers undertake to notify the Owners and the mortgagee(s), if any, of any occurrences in consequence of which the Vessel is likely to become a total loss as defined in this Clause. 406–416

**(e)** The Owners shall upon the request of the Charterers, promptly execute such documents as may 417–418

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "BARECON 2001" Standard Bareboat Charter

be required to enable the Charterers to abandon the 419
Vessel to insurers and claim a constructive total loss. 420
**(f)** For the purpose of insurance coverage against hull 421
and machinery and war risks under the provisions of 422
sub-clause 13(a), the value of the Vessel is the sum 423
indicated in Box 29. 424

**14. Insurance, Repairs and Classification** 425
~~(Optional, only to apply if expressly agreed and stated~~ 426
~~in Box 29, in which event Clause 13 shall be considered~~ 427
~~deleted).~~ 428
~~(a)   During the Charter Period the Vessel shall be kept~~ 429
~~insured by the Owners at their expense against hull and~~ 430
~~machinery and war risks under the form of policy or~~ 431
~~policies attached hereto. The Owners and/or insurers~~ 432
~~shall not have any right of recovery or subrogation~~ 433
~~against the Charterers on account of loss of or any~~ 434
~~damage to the Vessel or her machinery or appurt-~~ 435
~~enances covered by such insurance, or on account of~~ 436
~~payments made to discharge claims against or liabilities~~ 437
~~of the Vessel or the Owners covered by such insurance.~~ 438
~~Insurance policies shall cover the Owners and the~~ 439
~~Charterers according to their respective interests.~~ 440
~~(b)   During the Charter Period the Vessel shall be kept~~ 441
~~insured by the Charterers at their expense against~~ 442
~~Protection and Indemnity risks (and any risks against~~ 443
~~which it is compulsory to insure for the operation of the~~ 444
~~Vessel, including maintaining financial security in~~ 445
~~accordance with sub-clause 10(a)(iii)) in such form as~~ 446
~~the Owners shall in writing approve which approval shall~~ 447
~~not be unreasonably withheld.~~ 448
~~(c)   In the event that any act or negligence of the~~ 449
~~Charterers shall vitiate any of the insurance herein~~ 450
~~provided, the Charterers shall pay to the Owners all~~ 451
~~losses and indemnify the Owners against all claims and~~ 452
~~demands which would otherwise have been covered by~~ 453
~~such insurance.~~ 454
~~(d)   The Charterers shall, subject to the approval of the~~ 455
~~Owners or Owners' Underwriters, effect all insured~~ 456
~~repairs, and the Charterers shall undertake settlement~~ 457
~~of all miscellaneous expenses in connection with such~~ 458
~~repairs as well as all insured charges, expenses and~~ 459
~~liabilities, to the extent of coverage under the insurances~~ 460
~~provided for under the provisions of sub-clause 14(a).~~ 461
~~The Charterers to be secured reimbursement through~~ 462
~~the Owners' Underwriters for such expenditures upon~~ 463
~~presentation of accounts.~~ 464
~~(e)   The Charterers to remain responsible for and to~~ 465
~~effect repairs and settlement of costs and expenses~~ 466
~~incurred thereby in respect of all other repairs not~~ 467
~~covered by the insurances and/or not exceeding any~~ 468
~~possible franchise(s) or deductibles provided for in the~~ 469
~~insurances.~~ 470
~~(f)   All time used for repairs under the provisions of~~ 471
~~sub-clauses 14(d) and 14(e) and for repairs of latent~~ 472
~~defects according to Clause 3 above, including any~~ 473
~~deviation, shall be for the Charterers' account and shall~~ 474
~~form part of the Charter Period.~~ 475
~~The Owners shall not be responsible for any expenses~~ 476
~~as are incident to the use and operation of the Vessel~~ 477
~~for such time as may be required to make such repairs.~~ 478
~~(g)   If the conditions of the above insurances permit~~ 479
~~additional insurance to be placed by the parties such~~ 480
~~cover shall be limited to the amount for each party set~~ 481
~~out in Box 30 and Box 31, respectively. The Owners or~~ 482
~~the Charterers as the case may be shall immediately~~ 483
~~furnish the other party with particulars of any additional~~ 484
~~insurance effected, including copies of any cover notes~~ 485
~~or policies and the written consent of the insurers of~~ 486
~~any such required insurance in any case where the~~ 487
~~consent of such insurers is necessary.~~ 488
~~(h)   Should the Vessel become an actual, constructive,~~ 489
~~compromised or agreed total loss under the insurances~~ 490
~~required under sub-clause 14(a) all insurance payments~~ 491
~~for such loss shall be paid to the Owners, who shall~~ 492

~~distribute the moneys between themselves and the~~ 493
~~Charterers according to their respective interests.~~ 494
~~(i)   If the Vessel becomes an actual, constructive,~~ 495
~~compromised or agreed total loss under the insurances~~ 496
~~arranged by the Owners in accordance with sub-clause~~ 497
~~14(a), this Charter shall terminate as of the date of such~~ 498
~~loss.~~ 499
~~(j)   The Charterers shall upon the request of the~~ 500
~~Owners, promptly execute such documents as may be~~ 501
~~required to enable the Owners to abandon the Vessel~~ 502
~~to the insurers and claim a constructive total loss.~~ 503
~~(k)   For the purpose of insurance coverage against hull~~ 504
~~and machinery and war risks under the provisions of~~ 505
~~sub-clause 14(a), the value of the Vessel is the sum~~ 506
~~indicated in Box 29.~~ 507
~~(l)   Notwithstanding anything contained in sub-clause~~ 508
~~10(a), it is agreed that under the provisions of Clause~~ 509
~~14, if applicable, the Owners shall keep the Vessel's~~ 510
~~Class fully up to date with the Classification Society~~ 511
~~indicated in Box 10 and maintain all other necessary~~ 512
~~certificates in force at all times.~~ 513

**15. Redelivery** 514
At the expiration of the Charter Period the Vessel shall 515
be redelivered by the Charterers to the Owners at a 516
safe and ice-free port or place as indicated in Box 16, in 517
such ready safe berth as the **Charterers** Owners may 518
direct. The 519
Charterers shall give the Owners not less than thirty 519
(30) running days' preliminary notice of expected date, 520
range of ports of redelivery or port or place of redelivery 521
and not less than 5/3/2/1 fourteen (14) running days' 522
definite 522
notice of expected date and port or place of redelivery. 523
Any changes thereafter in the Vessel's position shall be 524
notified immediately to the Owners. 525
The Charterers warrant that they will not permit the 526
Vessel to commence a voyage (including any preceding 527
ballast voyage) which cannot reasonably be expected 528
to be completed in time to allow redelivery of the Vessel 529
within the Charter Period. Notwithstanding the above, 530
should the Charterers fail to redeliver the Vessel within 531
The Charter Period, the Charterers shall pay the daily 532
equivalent to the rate of hire stated in Box 22 plus 10 533
per cent. or to the market rate, whichever is the higher, 534
for the number of days by which the Charter Period is 535
exceeded. All other terms, conditions and provisions of 536
this Charter shall continue to apply. 537
Subject to the provisions of Clause 10, the Vessel shall 538
be redelivered to the Owners in the same or as good 539
structure, state, condition and class as that in which she 540
was delivered, fair wear and tear not affecting class 541
excepted. 542
The Vessel upon redelivery shall have her survey cycles 543
up to date and trading and class certificates valid for at 544
least the number of months agreed in Box 17. 545

**16. Non-Lien** 546
The Charterers will not suffer, nor permit to be continued, 547
any lien or encumbrance incurred by them or their 548
agents, which might have priority over the title and 549
interest of the Owners in the Vessel. The Charterers 550
further agree to fasten to the Vessel in a conspicuous 551
place and to keep so fastened during the Charter Period 552
a notice reading as follows: 553
"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and by the terms 555
of the Charter Party neither the Charterers nor the 556
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien 558
whatsoever." 559

**17. Indemnity** 560
**(a)** The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

by the Charterers, and against any lien of whatsoever 564
nature arising out of an event occurring during the 565
Charter Period. If the Vessel be arrested or otherwise 566
detained by reason of claims or liens arising out of her 567
operation hereunder by the Charterers, the Charterers 568
shall at their own expense take all reasonable steps to 569
secure that within a reasonable time the Vessel is 570
released, including the provision of bail. 571
Without prejudice to the generality of the foregoing, the 572
Charterers agree to indemnify the Owners against all 573
consequences or liabilities arising from the Master, 574
officers or agents signing Bills of Lading or other 575
documents. 576
**(b)** If the Vessel be arrested or otherwise detained by 577
reason of a claim or claims against the Owners, **by the** 578
**mortgage holder the** 
Owners shall at their own expense take all reasonable 579
steps to secure that within a reasonable time the Vessel 580
is released, including the provision of bail. 581
In such circumstances the Owners shall indemnify the 582
Charterers against any loss, damage or expense 583
incurred by the Charterers (including hire paid under 584
this Charter) as a direct consequence of such arrest or 585
detention. 586

**18. Lien** 587
The Owners to have a lien upon all cargoes, sub-hires 588
and sub-freights belonging or due to the Charterers or 589
any sub-charterers and any Bill of Lading freight for all 590
claims under this Charter, and the Charterers to have a 591
lien on the Vessel for all moneys paid in advance and 592
not earned. 593

**19. Salvage** 594
All salvage and towage performed by the Vessel shall 595
be for the Charterers' benefit and the cost of repairing 596
damage occasioned thereby shall be borne by the 597
Charterers. 598

**20. Wreck Removal** 599
In the event of the Vessel becoming a wreck or 600
obstruction to navigation the Charterers shall indemnify 601
the Owners against any sums whatsoever which the 602
Owners shall become liable to pay and shall pay in 603
consequence of the Vessel becoming a wreck or 604
obstruction to navigation. 605

**21. General Average** 606
The Owners shall not contribute to General Average. 607

**22. Assignment, Sub-Charter and Sale** 608
**(a)** The Charterers shall not assign this Charter nor 609
sub-charter the Vessel on a bareboat basis except with 610
the prior consent in writing of the Owners, which shall 611
not be unreasonably withheld, and subject to such terms 612
and conditions as the Owners shall approve. 613
**(b)** The Owners shall not sell the Vessel during the 614
currency of this Charter except with the prior written 615
consent of the Charterers, which shall not be unreason- 616
ably withheld, and subject to the buyer accepting an 617
assignment of this Charter. 618

**23. Contracts of Carriage** 619
*) **(a)** The Charterers are to procure that all documents 620
issued during the Charter Period evidencing the terms 621
and conditions agreed in respect of carriage of goods 622
shall contain a paramount clause incorporating any 623
legislation relating to carrier's liability for cargo 624
compulsorily applicable in the trade; if no such legislation 625
exists, the documents shall incorporate the Hague-Visby 626
Rules. The documents shall also contain the New Jason 627
Clause and the Both-to-Blame Collision Clause. 628
*) ~~(b) The Charterers are to procure that all passenger~~ 629
~~tickets issued during the Charter Period for the carriage~~ 630
~~of passengers and their luggage under this Charter shall~~ 631
~~contain a paramount clause incorporating any legislation~~ 632
~~relating to carrier's liability for passengers and their~~ 633

~~luggage compulsorily applicable in the trade; if no such~~ 634
~~legislation exists, the passenger tickets shall incorporate~~ 635
~~the Athens Convention Relating to the Carriage of~~ 636
~~Passengers and their Luggage by Sea, 1974, and any~~ 637
~~protocol thereto.~~ 638
*) ~~Delete as applicable.~~ 639

**24. Bank Guarantee** 640
*(Optional, only to apply if Box 27 filled in)* 641
~~The Charterers undertake to furnish, before delivery of~~ 642
~~the Vessel, a first class bank guarantee or bond in the~~ 643
~~sum and at the place as indicated in Box 27 as guarantee~~ 644
~~for full performance of their obligations under this~~ 645
~~Charter.~~ Corporate Guarantee to be attached to the 646
BBCHP.

**25. Requisition/Acquisition** 647
**(a)** In the event of the Requisition for Hire of the Vessel 648
by any governmental or other competent authority 649
(hereinafter referred to as "Requisition for Hire") 650
irrespective of the date during the Charter Period when 651
"Requisition for Hire" may occur and irrespective of the 652
length thereof and whether or not it be for an indefinite 653
or a limited period of time, and irrespective of whether it 654
may or will remain in force for the remainder of the 655
Charter Period, this Charter shall not be deemed thereby 656
or thereupon to be frustrated or otherwise terminated 657
and the Charterers shall continue to pay the stipulated 658
hire in the manner provided by this Charter until the time 659
when the Charter would have terminated pursuant to 660
any of the provisions hereof always provided however 661
that in the event of "Requisition for Hire" any Requisition 662
Hire or compensation received or receivable by the 663
Owners shall be payable to the Charterers during the 664
remainder of the Charter Period or the period of the 665
"Requisition for Hire" whichever be the shorter. 666
**(b)** In the event of the Owners being deprived of their 667
ownership in the Vessel by any Compulsory Acquisition 668
of the Vessel or requisition for title by any governmental 669
or other competent authority (hereinafter referred to as 670
"Compulsory Acquisition"), then, irrespective of the date 671
during the Charter Period when "Compulsory Acqui- 672
sition" may occur, this Charter shall be deemed 673
terminated as of the date of such "Compulsory 674
Acquisition". In such event Charter Hire to be considered 675
as earned and to be paid up to the date and time of 676
such "Compulsory Acquisition". 677

**26. War** 678
**(a)** For the purpose of this Clause, the words "War 679
Risks" shall include any war (whether actual or 680
threatened), act of war, civil war, hostilities, revolution, 681
rebellion, civil commotion, warlike operations, the laying 682
of mines (whether actual or reported), acts of piracy, 683
acts of terrorists, acts of hostility or malicious damage, 684
blockades (whether imposed against all vessels or 685
imposed selectively against vessels of certain flags or 686
ownership, or against certain cargoes or crews or 687
otherwise howsoever), by any person, body, terrorist or 688
political group, or the Government of any state 689
whatsoever, which may be dangerous or are likely to be 690
or to become dangerous to the Vessel, her cargo, crew 691
or other persons on board the Vessel. 692
**(b) The Charterers shall be at liberty to trade the** 693
**Vessel in War Risk Areas and any applicable**
**additional premium shall be for the Charterers'**
**account, but with full indemnity to Owners in regards**
**to ransoms/accidents/deaths or loss of cargo,**
**Charterers to show evidence of extra premia being**
**paid.** ~~The Vessel, unless the written consent of the~~ 694
~~Owners be first obtained, shall not continue to or go~~ 695
~~through any port, place, area or zone (whether of land~~ 696
~~or sea), or any waterway or canal, where it reasonably~~ 697
~~appears that the Vessel, her cargo, crew or other~~ 698
~~persons on board the Vessel, in the reasonable~~ 699
~~judgement of the Owners, may be, or are likely to be,~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

~~exposed to War Risks. Should the Vessel be within any~~ 700
~~such place as aforesaid, which only becomes danger-~~ 701
~~ous, or is likely to be or to become dangerous, after her~~ 702
~~entry into it, the Owners shall have the right to require~~ 703
~~the Vessel to leave such area.~~ 704
**(c)** The Vessel shall not load contraband cargo, or to 705
pass through any blockade, whether such blockade be 706
imposed on all vessels, or is imposed selectively in any 707
way whatsoever against vessels of certain flags or 708
ownership, or against certain cargoes or crews or 709
otherwise howsoever, or to proceed to an area where 710
she shall be subject, or is likely to be subject to 711
a belligerent's right of search and/or confiscation. 712
~~**(d)** If the insurers of the war risks insurance, when~~ 713
~~Clause 14 is applicable, should require payment of~~ 714
~~premiums and/or calls because, pursuant to the~~ 715
~~Charterers' orders, the Vessel is within, or is due to enter~~ 716
~~and remain within, any area or areas which are specified~~ 717
~~by such insurers as being subject to additional premiums~~ 718
~~because of War Risks, then such premiums and/or calls~~ 719
~~shall be reimbursed by the Charterers to the Owners at~~ 720
~~the same time as the next payment of hire is due.~~ 721
**(e)** The Charterers shall have the liberty: 722
**(i)** to comply with all orders, directions, recommend- 723
ations or advice as to departure, arrival, routes, 724
sailing in convoy, ports of call, stoppages, 725
destinations, discharge of cargo, delivery, or in any 726
other way whatsoever, which are given by the 727
Government of the Nation under whose flag the 728
Vessel sails, or any other Government, body or 729
group whatsoever acting with the power to compel 730
compliance with their orders or directions; 731
**(ii)** to comply with the orders, directions or recom- 732
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735
**(iii)** to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement. 744
**(f)** In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries: the United States of America; 747
Russia; the United Kingdom; France; and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15, if the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred under this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

**27. Commission** 764
The Owners to pay a commission at the rate indicated 765
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. ~~If no rate is indicated in Box 33,~~ 767
~~the commission to be paid by the Owners shall cover~~ 768
~~the actual expenses of the Brokers and a reasonable~~ 769
~~fee for their work.~~ 770
~~If the full hire is not paid owing to breach of the Charter~~ 771
~~by either of the parties the party liable therefor shall~~ 772
~~indemnify the Brokers against their loss of commission.~~ 773

~~Should the parties agree to cancel the Charter, the~~ 774
~~Owners shall indemnify the Brokers against any loss of~~ 775
~~commission but in such case the commission shall not~~ 776
~~exceed the brokerage on one year's hire.~~ 777

**28. Termination** 778
**(a)** Charterers' Default 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782
**(i)** the Charterers fail to pay hire in accordance with 783
Clause 11. However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice; 799
**(ii)** the Charterers fail to comply with the requirements of: 800
(1) Clause 6 (Trading Restrictions) 801
(2) Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803
written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809
**(iii)** the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814
insurance cover is not prejudiced. 815
**(b)** Owners' Default 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824
**(c)** Loss of Vessel 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss. For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive loss of the Vessel 835
has occurred. 836
~~**(d)** Either party shall be entitled to terminate this~~ 837
~~Charter with immediate effect by written notice to the~~ 838
~~other party in the event of an order being made or~~ 839
~~resolution passed for the winding up, dissolution,~~ 840
~~liquidation or bankruptcy of the other party (otherwise~~ 841
~~than for the purpose of reconstruction or amalgamation)~~ 842
~~or if a receiver is appointed, or if it suspends payment,~~ 843
~~ceases to carry on business or makes any special~~ 844
~~arrangement or composition with its creditors.~~ 845
**(e)** The termination of this Charter shall be without 846
prejudice to all rights accrued due between the parties 847

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BARECON 2001" Standard Bareboat Charter

prior to the date of termination and to any claim that 848
either party might have. 849

**29.   Repossession** 850
In the event of the termination of this Charter in 851
accordance with the applicable provisions of Clause 28, 852
the Owners shall have the right to repossess the Vessel 853
from the Charterers at her current or next port of call, or 854
at a port or place convenient to them without formality 855
or interference by the Charterers, courts or local 856
authorities. Pending physical repossession of the Vessel 857
in accordance with this Clause 29, the Charterers shall 858
hold the Vessel as gratuitous bailee only to the Owners. 859
The Owners shall arrange for an authorised represent- 860
ative to board the Vessel as soon as reasonably 861
practicable following the termination of the Charter. The 862
Vessel shall be deemed to be repossessed by the 863
Owners from the Charterers upon the boarding of the 864
Vessel by the Owners' representative.  All arrangements 865
and expenses relating to the settling of wages, 866
disembarkation and repatriation of the Charterers' 867
Master, officers and crew shall be the sole responsibility 868
of the Charterers. 869

**30.   Dispute Resolution** 870
*)   **(a)**   This Contract shall be governed by and construed 871
in accordance with English law and any dispute arising 872
out of or in connection with this Contract shall be referred 873
to arbitration in London in accordance with the Arbitration 874
Act 1996 or any statutory modification or re-enactment 875
thereof save to the extent necessary to give effect to 876
the provisions of this Clause. 877
The arbitration shall be conducted in accordance with 878
the London Maritime Arbitrators Association (LMAA) 879
Terms current at the time when the arbitration proceed- 880
ings are commenced. 881
The reference shall be to three arbitrators.  A party 882
wishing to refer a dispute to arbitration shall appoint its 883
arbitrator and send notice of such appointment in writing 884
to the other party requiring the other party to appoint its 885
own arbitrator within 14 calendar days of that notice and 886
stating that it will appoint its arbitrator as sole arbitrator 887
unless the other party appoints its own arbitrator and 888
gives notice that it has done so within the 14 days 889
specified.  If the other party does not appoint its own 890
arbitrator and give notice that it has done so within the 891
14 days specified, the party referring a dispute to 892
arbitration may, without the requirement of any further 893
prior notice to the other party, appoint its arbitrator as 894
sole arbitrator and shall advise the other party 895
accordingly.  The award of a sole arbitrator shall be 896
binding on both parties as if he had been appointed by 897
agreement. 898
Nothing herein shall prevent the parties agreeing in 899
writing to vary these provisions to provide for the 900
appointment of a sole arbitrator. 901
In cases where neither the claim nor any counterclaim 902
exceeds the sum of US$50,000 (or such other sum as 903
the parties may agree) the arbitration shall be conducted 904
in accordance with the LMAA Small Claims Procedure 905
current at the time when the arbitration proceedings are 906
commenced. 907
*)   ~~(b)   This Contract shall be governed by and construed~~ 908
~~in accordance with Title 9 of the United States Code~~ 909
~~and the Maritime Law of the United States and any~~ 910
~~dispute arising out of or in connection with this Contract~~ 911
~~shall be referred to three persons at New York, one to~~ 912
~~be appointed by each of the parties hereto, and the third~~ 913
~~by the two so chosen; their decision or that of any two~~ 914
~~of them shall be final, and for the purposes of enforcing~~ 915
~~any award,  judgement may be entered on an award by~~ 916
~~any court of competent jurisdiction.  The proceedings~~ 917
~~shall be conducted in accordance with the rules of the~~ 918
~~Society of Maritime Arbitrators, Inc.~~ 919
~~In cases where neither the claim nor any counterclaim~~ 920

~~exceeds the sum of US$50,000 (or such other sum as~~ 921
~~the parties may agree) the arbitration shall be conducted~~ 922
~~in accordance with the Shortened Arbitration Procedure~~ 923
~~of the Society of Maritime Arbitrators, Inc.  current at~~ 924
~~the time when the arbitration proceedings are commenced.~~ 925
*)   ~~(c)   This Contract shall be governed by and construed~~ 926
~~in accordance with the laws of the place mutually agreed~~ 927
~~by the parties and any dispute arising out of or in~~ 928
~~connection with this Contract shall be referred to~~ 929
~~arbitration at a mutually agreed place, subject to the~~ 930
~~procedure applicable there.~~ 931
**(d)**   Notwithstanding (a), (b) or (c) above, the parties 932
may agree at any time to refer to mediation any 933
difference and/or dispute arising out of or in connection 934
with this Contract. 935
In the case of a dispute in respect of which arbitration 936
has been commenced under (a), (b) or (c) above, the 937
following shall apply:- 938
**(i)**   Either party may at any time and from time to time 939
elect to refer the dispute or part of the dispute to 940
mediation by service on the other party of a written 941
notice (the "Mediation Notice") calling on the other 942
party to agree to mediation. 943
**(ii)**   The other party shall thereupon within 14 calendar 944
days of receipt of the Mediation Notice confirm that 945
they agree to mediation, in which case the parties 946
shall thereafter agree a mediator within a further 947
14 calendar days, failing which on the application 948
of either party a mediator will be appointed promptly 949
by the Arbitration Tribunal ("the Tribunal") or such 950
person as the Tribunal may designate for that 951
purpose.  The mediation shall be conducted in such 952
place and in accordance with such procedure and 953
on such terms as the parties may agree or, in the 954
event of disagreement, as may be set by the 955
mediator. 956
**(iii)**   If the other party does not agree to mediate, that 957
fact may be brought to the attention of the Tribunal 958
and may be taken into account by the Tribunal when 959
allocating the costs of the arbitration as between 960
the parties. 961
**(iv)**   The mediation shall not affect the right of either 962
party to seek such relief or take such steps as it 963
considers necessary to protect its interest. 964
**(v)**   Either party may advise the Tribunal that they have 965
agreed to mediation. The arbitration procedure shall 966
continue during the conduct of the mediation but 967
the Tribunal may take the mediation timetable into 968
account when setting the timetable for steps in the 969
arbitration. 970
**(vi)**   Unless otherwise agreed or specified in the 971
mediation terms, each party shall bear its own costs 972
incurred in the mediation and the parties shall share 973
equally the mediator's costs and expenses. 974
**(vii)**   The mediation process shall be without prejudice 975
and confidential and no information or documents 976
disclosed during it shall be revealed to the Tribunal 977
except to the extent that they are disclosable under 978
the law and procedure governing the arbitration. 979
*(Note: The parties should be aware that the mediation* 980
*process may not necessarily interrupt time limits.)* 981
**(e)**   If Box 35 in Part I is not appropriately filled in, sub-clause 982
30(a) of this Clause shall apply. Sub-clause 30(d) shall 983
apply in all cases. 984
*)   *Sub-clauses 30(a), 30(b) and 30(c) are alternatives;* 985
*indicate alternative agreed in Box 35.* 986

**31.   Notices** 987
**(a)**   Any notice to be given by either party to the other 988
party shall be in writing and may be sent by fax, telex, e- 989
mail
registered or recorded mail or by personal service. 990
**(b)**   The address including e-mail(s) of the Parties for 991
service of such
communication shall be as stated in Boxes 3 and 4 992
respectively. 993

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"BARECON 2001" Standard Bareboat Charter

PART III
PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
*(Optional, only to apply if expressly agreed and stated in Box 37)*

OPTIONAL
PART

**1.    Specifications and Building Contract**
**(a)**  The Vessel shall be constructed in accordance with
the Building Contract (hereafter called "the Building
Contract") as annexed to this Charter, made between the
Builders and the Owners and in accordance with the
specifications and plans annexed thereto, such Building
Contract, specifications and plans having been counter-
signed as approved by the Charterers.
**(b)**  No change shall be made in the Building Contract or
in the specifications or plans of the Vessel as approved by
the Charterers as aforesaid, without the Charterers'
consent.
**(c)**  The Charterers shall have the right to send their
representative to the Builders' Yard to inspect the Vessel
during the course of her construction to satisfy themselves
that construction is in accordance with such approved
specifications and plans as referred to under sub-clause
(a) of this Clause.
**(d)**  The Vessel shall be built in accordance with the
Building Contract and shall be of the description set out
therein. Subject to the provisions of sub-clause 2(c)(ii)
hereunder, the Charterers shall be bound to accept the
Vessel from the Owners, completed and constructed in
accordance with the Building Contract, on the date of
delivery by the Builders. The Charterers undertake that
having accepted the Vessel they will not thereafter raise
any claims against the Owners in respect of the Vessel's
performance or specification or defects, if any.
Nevertheless, in respect of any repairs, replacements or
defects which appear within the first 12 months from
delivery by the Builders, the Owners shall  endeavour to
compel the Builders to repair, replace or remedy any defects
or to recover from the Builders any expenditure incurred in
carrying out such repairs, replacements or remedies.
However, the Owners' liability to the Charterers shall be
limited  to the extent the Owners have a valid claim against
the Builders under the guarantee clause of the Building
Contract (a copy whereof has been supplied to the
Charterers). The Charterers shall be bound to accept such
sums as the Owners are reasonably able to recover under
this Clause and shall make no further claim on the Owners
for the difference between the amount(s) so recovered and
the actual expenditure on repairs, replacement or
remedying defects or for any loss of time incurred.
Any liquidated damages for physical defects or deficiencies
shall accrue to the account of the party stated in Box 41(a)
or if not filled in shall be shared equally between the parties.
The costs of pursuing a claim or claims against the Builders
under this Clause (including any liability to the Builders)
shall be borne by the party stated in Box 41(b) or if not
filled in shall be shared equally between the parties.

**2.    Time and Place of Delivery**
**(a)**  Subject to the Vessel having completed her
acceptance trials including trials of cargo equipment in
accordance with the Building Contract and specifications
to the satisfaction of the Charterers, the Owners shall give
and the Charterers shall take delivery of the Vessel afloat
when ready for delivery and properly documented at the
Builders' Yard or some other safe and readily accessible
dock, wharf or place as may be agreed between the parties
hereto and the Builders. Under the Building Contract the
Builders have estimated that the Vessel will be ready for
delivery to the Owners as therein provided but the delivery
date for the purpose of this Charter shall be the date when
the Vessel is in fact ready for delivery by the Builders after
completion of trials whether that be before or after as
indicated in the Building Contract. The Charterers shall not
be entitled to refuse acceptance of delivery of the Vessel

and upon and after such acceptance, subject to Clause
1(d), the Charterers shall not be entitled to make any claim
against the Owners in respect of any conditions,
representations or warranties, whether express or implied,
as to the seaworthiness of the Vessel or in respect of delay
in delivery.
**(b)**  If for any reason other than a default by the Owners
under the Building Contract, the Builders become entitled
under that Contract not to deliver the Vessel to the Owners,
the Owners shall upon giving to the Charterers written
notice of Builders becoming so entitled, be excused from
giving delivery of the Vessel to the Charterers and upon
receipt of such notice by the Charterers this Charter shall
cease to have effect.
**(c)**  If for any reason the Owners become entitled under
the Building Contract to reject the Vessel the Owners shall,
before exercising any such right of rejection, consult the
Charterers and thereupon
(i) if the Charterers do not wish to take delivery of the Vessel
they shall inform the Owners within seven (7) running days
by notice in writing and upon receipt by the Owners of such
notice this Charter shall cease to have effect; or
(ii) if the Charterers wish to take delivery of the Vessel
they may by notice in writing within seven (7) running days
require the Owners to negotiate with the Builders as to the
terms on which delivery should be taken and/or refrain from
exercising their right to rejection and upon receipt of such
notice the Owners shall commence such negotiations and/
or take delivery of the Vessel from the Builders and deliver
her to the Charterers;
(iii) in no circumstances shall the Charterers be entitled to
reject the Vessel unless the Owners are able to reject the
Vessel from the Builders;
(iv) if this Charter terminates under sub-clause (b) or (c) of
this Clause, the Owners shall thereafter not be liable to the
Charterers for any claim under or arising out of this Charter
or its termination.
**(d)**  Any liquidated damages for delay in delivery under the
Building Contract and any costs incurred in pursuing a claim
therefor shall accrue to the account of the party stated in
Box 41(c) or if not filled in shall be shared equally between
the parties.

**3.    Guarantee Works**
If not otherwise agreed, the Owners authorise the
Charterers to arrange for the guarantee works to be
performed in accordance with the building contract terms,
and hire to continue during the period of guarantee works.
The Charterers have to advise the Owners about the
performance to the extent the Owners may request.

**4.    Name of Vessel**
The name of the Vessel shall be mutually agreed between
the Owners and the Charterers and the Vessel shall be
painted in the colours, display the funnel insignia and fly
the house flag as required by the Charterers.

**5.    Survey on Redelivery**
The Owners and the Charterers shall appoint surveyors
for the purpose of determining and agreeing in writing the
condition of the Vessel at the time of re-delivery.
Without prejudice to Clause 15 (Part II), the Charterers
shall bear all survey expenses and all other costs, if any,
including the cost of docking and undocking, if required,
as well as all repair costs incurred. The Charterers shall
also bear all loss of time spent in connection with any
docking and undocking as well as repairs, which shall be
paid at the rate of hire per day or pro rata.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

### "BARECON 2001" Standard Bareboat Charter

**PART IV**
**HIRE/PURCHASE AGREEMENT**
*(Optional, only to apply if expressly agreed and stated in Box 42)*

OPTIONAL
PART

| | |
|---|---|
| On expiration of this Charter and provided the Charterers | 1 |
| have fulfilled their obligations according to Part I and II | 2 |
| as well as Part III, if applicable, it is agreed, that on | 3 |
| payment of the final payment of hire as per Clause 11 | 4 |
| the Charterers have purchased the Vessel with | 5 |
| everything belonging to her and the Vessel is fully paid | 6 |
| for. | 7 |

*In the following paragraphs the Owners are referred to* — 8
*as the Sellers and the Charterers as the Buyers.* — 9

The Vessel shall be delivered by the Sellers and taken — 10
over by the Buyers on expiration of the Charter. — 11

The Sellers guarantee that the Vessel, at the time of — 12
delivery, is free from all encumbrances and maritime — 13
liens or any debts whatsoever other than those arising — 14
from anything done or not done by the Buyers or any — 15
existing mortgage agreed not to be paid off by the time — 16
of delivery. Should any claims, which have been incurred — 17
prior to the time of delivery be made against the Vessel, — 18
the Sellers hereby undertake to indemnify the Buyers — 19
against all consequences of such claims to the extent it — 20
can be proved that the Sellers are responsible for such — 21
claims. Any taxes, notarial, consular and other charges — 22
and expenses connected with the purchase and — 23
registration under Buyers' flag, shall be for Buyers' — 24
account. Any taxes, consular and other charges and — 25
expenses connected with closing of the Sellers' register, — 26
shall be for Sellers' account. — 27

In exchange for payment of the last month's hire — 28
instalment the Sellers shall furnish the Buyers with a — 29
Bill of Sale duly attested and legalized, together with a — 30
certificate setting out the registered encumbrances, if — 31
any. On delivery of the Vessel the Sellers shall provide — 32
for deletion of the Vessel from the Ship's Register and — 33
deliver a certificate of deletion to the Buyers. — 34
The Sellers shall, at the time of delivery, hand to the — 35
Buyers all classification certificates (for hull, engines, — 36
anchors, chains, etc.), as well as all plans which may — 37
be in Sellers' possession. — 38

The Wireless Installation and Nautical Instruments, — 39
unless on hire, shall be included in the sale without any — 40
extra payment. — 41

The Vessel with everything belonging to her shall be at — 42
Sellers'-risk and expense until she is delivered to the — 43
Buyers, subject to the conditions of this Contract and — 44
the Vessel with everything belonging to her shall be — 45
delivered and taken over as she is at the time of delivery, — 46
after which the Sellers shall have no responsibility for — 47
possible faults or deficiencies of any description. — 48

The Buyers undertake to pay for the repatriation of the — 49
Master, officers and other personnel if appointed by the — 50
Sellers to the port where the Vessel entered the Bareboat — 51
Charter as per Clause 3 (Part II) or to pay the equivalent — 52
cost for their journey to any other place. — 53



This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**"BARECON 2001" Standard Bareboat Charter**

OPTIONAL
PART

**PART V**

**PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY**

*(Optional, only to apply if expressly agreed and stated in Box 43)*

| | |
|---|---|
| **1. Definitions** | 1 |
| For the purpose of this PART V, the following terms shall | 2 |
| have the meanings hereby assigned to them: | 3 |
| "The Bareboat Charter Registry" shall mean the registry | 4 |
| of the State whose flag the Vessel will fly and in which | 5 |
| the Charterers are registered as the bareboat charterers | 6 |
| during the period of the Bareboat Charter. | 7 |
| "The Underlying Registry" shall mean the registry of the | 8 |
| state in which the Owners of the Vessel are registered | 9 |
| as Owners and to which jurisdiction and control of the | 10 |
| Vessel will revert upon termination of the Bareboat | 11 |
| Charter Registration. | 12 |
| | |
| **2. Mortgage** | 13 |
| The Vessel chartered under this Charter is financed by | 14 |
| a mortgage and the provisions of Clause 12(b) (Part II) | 15 |
| shall apply. | 16 |

| | |
|---|---|
| **3. Termination of Charter by Default** | 17 |
| If the Vessel chartered under this Charter is registered | 18 |
| in a Bareboat Charter Registry as stated in Box 44, and | 19 |
| if the Owners shall default in the payment of any amounts | 20 |
| due under the mortgage(s) specified in Box 28, the | 21 |
| Charterers shall, if so required by the mortgagee, direct | 22 |
| the Owners to re-register the Vessel in the Underlying | 23 |
| Registry as shown in Box 45. | 24 |
| In the event of the Vessel being deleted from the | 25 |
| Bareboat Charter Registry as stated in Box 44, due to a | 26 |
| default by the Owners in the payment of any amounts | 27 |
| due under the mortgage(s), the Charterers shall have | 28 |
| the right to terminate this Charter forthwith and without | 29 |
| prejudice to any other claim they may have against the | 30 |
| Owners under this Charter. | 31 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**RIDER CLAUSES TO CHARTER PARTY**
**M.T. "CV STEALTH "**
**DATED 23rd February 2010**

**CLAUSE 1.   CANCELLATION OF BAREBOAT CHARTER:**

Owners during this charter have the right to sell the Vessel to a third party at any time hereunder
with the following conditions:

(a) Sale of the vessel to third party shall by no means affect the continuation of this charter and
the new owner shall comply in full with a] I the terms and conditions of this Charter Party.

(b) Charterers always to have the right of first refusal to buy the Vessel.

(c) Any new owner always to be approved by Charterer, such approval shall not be unreasonably
withheld.

**CLAUSE 2.   DRY DRY-DOCKS:**

Charterers have the obligation to dry-dock the Vessel and/or to pass all surveys strictly in
accordance with the rules and regulations of Vessel's Class and flag including Special Survey and
Dry Dock always un-extended at Charterers cost and expenses.

**CLAUSE 3.   BUNKER CLAUSE:**

Charterers warrant that all bunkers in accordance with herewith shall be of a quality complying
380 CST with ISO 8217 RMG 35 and with its specification for marine fuels as amended from time
to time.

**CLAUSE 4.   CHARTERERS LIABILITIES:**

Charterers hereby indemnify Owners from and again any all liabilities, claims, losses, damage,
costs or expenses suffered or incurred, against Owners arising out of Charterers' negligence or
failure to comply with the requirements of any government, including Federal, state or municipal
or other division or authorities.

**CLAUSE 5.   OIL POLLUTION:**

Charterers warrant that the Vessel shall have a valid P&I insurance against liability for pollution,
including ITOPF/CLC obligations for an amount not less than USD One (1) billion per incident,
provided, however that if the P&I Club in which the vessel entered and/or the underwriter(s)

1





cease to provide Pollution Liability Coverage to such Club's Members in the amount(s) as just described then Charterers shall promptly obtain Pollution Liability Cover (both basis P&I Clubs and Additional Insurance) in the highest amount(s) then made available by any first class Underwriter.

## CLAUSE 6.   RISKS AND INSURANCE OF THE VESSEL:

(a) For the purpose of this Charter, "Total Loss" has the meaning given to it in Part 11, "Compulsory Acquisition" has the meaning given to it in Clause 25 above and "Major Casualty" mean a casualty to the Vessel or incident (other than a Total Loss) in respect of which the claim or aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds Five Hundred Thousand United States Dollars (US$500,000) or the equivalents in any other currency.

(b) The Vessel shall throughout the term of this Charter be in every respect at the risk  of      the Charterers who shall bear all risks however arising whether of navigation operation or maintenance of the Vessel or otherwise.

(c) In addition to the insurance's referred to in Clause 13 and in this clause, the owners shall be entitled to effect and maintain for its own benefit and its own cost, innocent Owner's interest insurance for an amount to be determined by Owners in Owners' role discretion and, for the benefit of any mortgagee or mortgagees pursuant to mortgagees indemnity insurance.

(d) The Charterers undertake throughout the term of this Charter, without prejudice to their obligation under Clause 13 above:

(i) to effect and maintain sufficient insurance on and over the Vessel inrespect of hull, machinery and equipment, marine and war risks (including excess risks), protection and indemnity risks, FD and D, and oil pollution liability (if appropriate) upon such terms as shall from time to time be approved in writing by the owners and in such amounts in United States Dollars from time to time as are set out in the Schedule to these Additional Clauses in the case of bull ,machinery and equipment, marine and war risks and excess risks and in the case of protection and indemnity risks and oil pollution liability, for the maximum amount obtainable from the protection and indemnity association in which the Vessel is from time to time entered;

(ii) Without prejudice to the provisions of sub-clause (i) above, Charterers shall procure and arrange at their own expense Hull and Machinery and war risks insurance's under terms not less favourable than those of  Institute Time clauses Hulls edition 1.10.83 and/or as amended from time to time and Institute War and Strike Clauses Hull Time addition 1.. 10.83 with deductible not exceeding USD 225,000. Charterers shall in addition procure and maintain at their own expense full entry of the Vessel for oil pollution liabilities at the maximum amount available on the insurance market (presently such amount is equal to One Thousand Million United States Dollars (US$ 1,000,000,000) and



2nd original



ARROW
TANKERS A/S

**m.t. CV STEALTH – CP dated 23rd February 2010**

to arrange and pay for extra cover required by protection and indemnity associations for voyagers to any other country.

(iii) To effect the insurances aforesaid through first class insurance companies, underwriters and war risks associations operating in the London, American or others Insurance market and protection and Indemnity associations which are members of the International Group of Protection and Indemnity Associations;

(iv) To renew the insurances aforesaid at least fourteen (14) days before the relevant policies or contracts expire and to procure that the said brokers, and any war risks and protection and indemnity association with which such insurances are effected, shall promptly confirm in writing to the Owners the terms and conditions of such renewal as and when the same occurs;

(v) Punctually to pay all premiums, calls, contributions or other sums in respect of the insurances and to produce all relevant receipts when so required by the Owners;

(vi) To procure that a loss payable clause in such form as may be required by the Owners is endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued in respect of the insurance of the vessel;

(vii) To procure that all such instruments of insurance referred to sub-clause (iv) above are as effected through the said brokers shall be deposited with the said brokers, and that such brokers shall furnish the Owners with proforma copies and a letter or letters of undertaking in such form as may be required by the Owners;

(viii) To procure that the protection and indemnity and/or war risks associations in which the Vessel is entered shall furnish the Owners with a certified copy of the certificate of entry for the vessel and a letter or letters of undertaking in the Protection & Indemnity Association's standard wording;

(ix) To apply all such sums receivable in respect of the insurances of the Vessel as are paid to Charterers in accordance with the provisions of this Charter for the purpose of making good the loss and fully repairing the damage in respect of which such sums have been received;

(x) Not to alter any of the terms of any if the instruments of insurance referred to in sub-clause (vi) above which have been approved by the Owners and not to make, do, consent or agree to any act or omission which would or might render any such instrument or insurance invalid, void, voidable or unenforceable or render any sum payable there under repayable in whole or in part

(xi) Not without the prior written consent of the Owners to settle, compromise or abandon any claim for Total Loss or a Major casualty

3



**m.t. CV STEALTH – CP dated 23rd February 2010**

(e) Unless and until a Termination Event shall occur whereupon all insurance recoveries shall be payable to the Owners, any sums receivable in respect of the insurances effected by the Charterers pursuant to Clause 13 above and this Clause shall be payable as follows ;

(i) there shall be paid to the Owners all sums receivable in respect of Total loss and, unless otherwise authorized by the Owners, any and every sum receivable in respect of a Major Casualty, but so that the insurance moneys received by the Owners in respect of any such Major Casualty shall be paid over to the Charterers upon the charterers furnishing evidence to Owner's underwriter's satisfaction that all loss and damage resulting from the casualty has been properly made good and repaired, and that all repair accounts and other liabilities whatsoever in connection with the casualty have been fully paid and discharged by the Charterers, provided that the insurers may with the consent of the Owners make payment on account of repairs in the course of their being effected

(ii) all other sums receivable in respect of the insurances shall be paid to the Charterers and shall be applied by them for the purpose of making good the loss and fully repairing all damage in respect of which the insurance moneys have been received.

(f) The provisions of Clause 13 and of this Clause shall not apply to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit, provided that such cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 13 and to this Clause permit.

(g) In the event that at any time during the term of this Charter the Charterers shall not have paid the premiums in respect of the insurance cover required by this charter, the Owners shall notify the Charterers requiring rectification thereof but in any event shall be at liberty to pay such premiums or to effect, at the Charterers expense, such alternative insurance as the Owners may in their discretion determine to be necessary to protect the interests of the Owners under this Charter (and approved mortgagees if any) and the costs thereof shall be payable by the Charterers on demand and shall be recoverable as additional hire hereunder.

## CLAUSE 7.  **INTEREST:**

The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it fell due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers to be equal to one month London Interbank Offer Rate (LIB OR) plus 2 percent (2%) per annum~ provided always that where the Owners pay or incur any such costs, charges

4



**m.t. CV STEALTH – CP dated 23rd February 2010**

expenses claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, Interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of Interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.

## CLAUSE 8. CHARTERERS' COVENANTS:

The Charterers Covenant with the Owners undertake throughout the term of this Charter that!

(a) they will provide the Owners with such information concerning the Vessel as the Owners may from time to time reasonable require including (without limitation) information regarding the employment, condition, geographical position and crewing of the vessel;

(b) They will, forthwith upon becoming aware of the same, notify the owners in writing of any termination event (or event of which they are aware which, with the giving of notice and/or lapse of time would constitute a termination event);

(c) They will obtain and promptly renew from time to time and will whenever so required promptly furnish certified copies to the Owners of all such authorizations, approvals, consents, and licenses (if any) as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;

(d) they will- (i) at any time during this charter, subject to a limit of one (1) month in ever calendar year, allow one representative of Owners, and, (ii) during the last voyage) prior to vessel' s dry dock or special survey (laden voyage), two representatives to be allowed onboard (iii) during the last round voyage (ballast and laden legs) before redelivery of the Vessel allow up to two (2) representatives of the Owners to attend on board the Vessel for general observation and inspection purposes always at the risk-and expense of the Owners provided that such observation and inspection shall not interfere with the ordinary work on board and the trading of the Vessel and subject to signing Charterers P&I Club Indemnity forms which shall be presented to them for signature upon boarding;





**m.t. CV STEALTH – CP dated 23rd February 2010**

(e) They will notify the Owners forthwith by telex, telefax or e-mail previously provided of:

(1) Any accident to the Vessel or incident which is or is likely to be a Major Casualty;

(2) Any occurrence resulting in the Vessel becoming or being likely to become a Total loss;

(3) Any requirement or recommendation made by an insurer or classification society, or by any competent authority, which is not complied with within any time limit imposed by such insurer, classification society or authority;

(4) Any arrest of the Vessel, or the exercise or purported exercise of any lien on the vessel or any requisition of the Vessel for hire.

(f) They will procure that at all times the Vessel is managed only by the Charterers or Charterers' associated company or such managers as shall be approved in writing by the Owners such approval not to be unreasonably withheld. In the event Charterers decide to appoint a third-party manager then Charterers shall invite Owners or their nominees to submit a quotation for the management of the Vessel;

(g) They will maintain the Vessel at all times in accordance with the requirements of (INSERT CLASS) to a standard not less than that to which the Charterers maintain the other vessels owned by the Charterers or their associated companies;

(h) That the Vessel shall remain the property of the Owners and that the Charterers shall have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners in and to the Vessel.


**CLAUSE 9.   INDEMNITY:**

The Charterers shall pay to the Owners on demand, and indemnity and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal)~ liabilities, losses~ penalties, fines, duties and fees (including, but not limited to reasonable, legal fees and expenses on a full indemnity basis provided that Owner's are the prevailing party on any such claim generating such legal fees and expenses) and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering, navigation, victualling, fuelling, manning, supply, insurance, use, operation, return, re-deli very, laying up or storage of or loss of or damage of the Vessel or any other vessel in the actual or disponent ownership of the Charterers or any part thereof or from any maintenance, service, modification~ repair, classification or overhaul of, or otherwise in connection with, the Vessel or such other vessel or any part thereof or any cargo carried therein, and regardless of when the same shall arise and whether or not the Vessel or other vessel or the relevant part thereof

6

**2nd original**



**m.t. CV STEALTH – CP dated 23rd February 2010**

is in the possession or control of the Charterers; the indemnities contained in this Clause 10, and each other indemnity contained in this Charter shall survive any termination or expiry of this Charter for a period of twelve (12) months from the date thereof and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter. Charterers will cover all taxes including US freight taxes if any but excluding tax on income from Vessel's trading.

## CLAUSE 10.  TERMINATION EVENTS:

Each of the following events shall be a "Termination Event" for the purposes of this Charter:

(a) The Charterers fail to make any payment on its due date or in respect of money payable on demand, (unless otherwise specifically provided) within seven (7) days from the date of such demand;

(b) The Charterers are in breach of anyone or more of the provisions of this Charter relation to the insurance of the Vessel;

(c) The Charterers fail to comply with any provision of this Charter other than those referred to in sub-clauses (a) and (b) above and in case of any such default which the Owners considers capable of remedy, such default continues for a period fourteen  (14) days after the Owners, by notice to the Charterers, require the same to be remedied;

(d)  Any license, approval, consent authorization or registration at any time necessary for  the validity, enforceability, admissibility in evidence of this Charter, or for the Charterers to comply with their obligations hereunder or in connection with the ownership or operation of the vessel is revoked, withheld or expires;

(e) The Vessel becomes a Total Loss;

(f) A petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of the Charterers (other than the purposes of amalgamation or reconstruction in respect of which the prior written approval shall not be unreasonably withheld) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to the Charterers or if the Charterers suspend payment of, or are unable to or admit inability to pay ~ their debts as they fall due or make any special arrangement or composition with their creditors generally or any class of their creditors;

(g) As administrator, administrative receivers, receiver or trustee or similar official is appointed of or an encumbrances takes possession of, or execution or distress *is* levied upon~ the whole, or what the Owners consider a material part, of the property, assets or undertaking of the Charterers, or the Charterers apply for, or consent to, any such appointment;

(h) The Charterers cease, or threaten to cease, to carry on their business} or dispose or threaten to dispose of what the Owners consider a material part of their property, assets or undertaking, or such a part is seized or appropriated;

7

**2nd original**



**m.t. CV STEALTH – CP dated 23rd February 2010**

ARROW
TANKERS A/S

(i) The Vessel is the subject of a Compulsory Acquisition;

(j) It becomes impossible or unlawful for the Charterers to fulfil any of their obligations under this Charter

Each of the events specified in the above-mentioned clause shall constitute (as the case may be) a repudiatory breach or a breach of condition of this Charter by the Charterers, the occurrence of which will entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel by the Charterers under this Charter, to recover amounts, to claim damages and/or to exercise any other right or remedy to which the Owners may be entitled under this Charter or at law, in equity or otherwise as a consequence of the occurrence of the termination event.

## CLAUSE 11.  OWNERS' RIGHTS ON A TERMINATION EVENT:

(a) If any termination even shall occur, the Owners may thereupon and at any time thereafter at their option take anyone or more of the following actions:

> (i) Take all action which the Owners may reasonably consider necessary to cure any such Termination Event and recover from Charterers all liabilities, reasonable costs and expenses or incurred by the Owners in doing so;

> (ii) By notice to the Charterers terminate the chartering of the Vessel by the Charterers under this Charter, either immediately or on such date as the Owners may specify, whereupon:

A) the Vessel shall no longer be in the possession of the Charterers, in accordance with Owner's instructions with the consent of the Owners and the Charterers shall promptly redeliver the Vessel to the Owners with all reasonable dispatch in the manner and in the condition governing redelivery as specified under this charter; and;

B) the Owners shall be entitled but not bound (and not without prejudice to the Charterers' obligation under sub-clause (A) above) to retake possession of the Vessel wherever found, irrespective of whether the Charterers, any sub-charterer or any other person may be in possession of the Vessel without being bound to give any prior notice or take any legal process and without liability to the part of the Owners, and the Charterers hereby authorize the Owners, for that purpose, to enter upon any premises where the Vessel may be located.

(b) If the Owners give notice pursuant to sub-clause (a) above to terminate the chartering of the vessel by the charterers, the charterers shall forthwith pay to the Owners all sums of money whether of hire or otherwise due and payable but unpaid under this Charter upon which the Charterers' obligation to pay hire shall cease and the Vessel shall be redelivered to the

 2nd original



**m.t. CV STEALTH – CP dated 23rd February 2010**

Owners in accordance with this Charter Party.

(c) At any time after giving notice of termination in accordance with sub-clause (a) above the Owners shall be entitled (but not bound) to sell the vessel, free of this Charter and any right or claim of whatsoever nature of the Charterers whether under this Charter or otherwise and free of any other charter or other engagement concerning her, for such price and on such terms and conditions as they may in their abso1ute discretion think fit.

## CLAUSE 12. <u>CONTRADICTION CLAUSE</u>

If there happens to be a discrepancy between the "Barecon 01" as mutually agreed and amended by Owners and Charterers and the Owners additional terms, then additional terms to always supersede the CIP.

## CLAUSE 13. <u>THE CHARTER SHALL HAVE THE OPTION TO PURCHASE THE VESSEL AT THE ALTERNATIVE DATES AND PRICES SET OUT BELOW:</u>

On the 3rd Anniversary of the delivery date for a price of USD 47 million
On the 4th Anniversary of the delivery date for a price of USD 45.5 million
On the 5th Anniversary of the delivery date for a price of USD 42 million
On the 6th Anniversary of the delivery date for a price of USD 41 million
On the 7th Anniversary of the delivery date for a price of USD 39 million

(Each of the 3rd, 4th, 5th, 6th and 7th Anniversary of the delivery date shall hereinafter be referred to as the "Purchase Option Date")

The Charterers shall give the Owners notice in writing (the "Notice") of their intention to exercise the purchase option at least 5 MONTHS prior to the relevant Purchase Option Date. On receipt of the Notice the Owners shall take all necessary steps to ensure that there is a smooth transfer of ownership of the Vessel to the Charterers on the relevant Purchase Option Date. The Owners and Charterers agree that the sale and purchase of the Vessel shall be on the terms and conditions of the standard NSF 93 form with logical amendments which the Owners and Charterers agree to conclude and sign at least 90 days prior to the relevant Purchase Option Date.

2nd original



m.t. CV STEALTH – CP dated 23rd February 2010

**CLAUSE 14.**

MT CV Stealth shall not be delivered to Charterers before 15 April 2010 / 0001hrs lt and Chrtrs shall have the option of cancelling this charter if the ship is not ready and at their disposal on or before 30 August 2010 / 2359hrs lt.

**CLAUSE 15.**

Owners to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of delivery.
Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.

**CLAUSE 16.**

Owners warrant to the best of their knowledge that at the time of delivery into the bareboat charter the ship is not blacklisted by the Arab Boycott League.

**CLAUSE 17.**

Charterers have the option to load and/or discharge and/or lighten the vessel via ship to ship transfer in accordance with the procedure set out in OCIM's `Ship to Ship Transfer Guide´. But not more than 60 lightering days per annum.

**CLAUSE 18.**

Local time for laycan, GMT for hire calculation.

**CLAUSE 19.**

Antifouling application will be 60 months period during the next drydocking and Owners will maintain the original paint condition of entire hull of the both ships applying appropriate touch up and final coats as per NB specifications. If present BB Charterers normally apply 30 months paint, Headowners will ask present BB Charterers (AET) to apply 60 months paint when in drydock for SS. Difference in cost will be borne by new BB Charterers (GEDEN)

**2nd original**



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

**CLAUSE 20.**

With regard to EU Directive 2005/33/EC low Sulphur use in EU, the Charterers are seeking to get confirmation from the existing Bareboat Charterers ( Messrs AET )  to make the necessary applications and communications with the Class to get an extension of 8 months of the implementation date 01.01.2010.

For the Charterers

For the Owners

## ADDENDUM NO. 1

Charter Party dated 23rd February 2010 for
M.T. "CV STEALTH"

    With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

Box 4 of the Barecon Charter Party should read:

"Geden Holdings Limited, Malta or nominee always guaranteed by Geden Holdings Limited, Malta. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed."

    IN WITNESS WHEREOF, the parties have caused this Addendum No.1 to be duly executed in Copenhagen on this 2nd day of June 2010.

Owners :

By : Himoza Dimareli
Title : Director

Charterers:

By :
Title : Tzurvn Trolcfor
DIRECTOR

## ADDENDUM NO. 2

Charter Party dated 23rd February 2010 for
M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

**Box 22 of the Barecon Charter Party should read:**
USD 8,750 gross pdpr for the first 365 days after delivery
USD 9,750 gross pdpr for the 2nd charter year
USD 10,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year
USD 9,750 gross pdpr for the 4th charter year
USD 9,750 gross pdpr for the 5th charter year
USD 13,250 for the optional period.

**Clause 13 of Rider Clauses:**
To be deleted.

**Delivery:**
Delivery is agreed to be effected when inventory count is completed and agreed between the parties onboard the vessel.

IN WITNESS WHEREOF, the parties have caused this Addendum No.2 to be duly executed in Copenhagen on this 21st day of June 2010.

Owners :

By    : Mimoza Dimareli
Title :    DIRECTOR

Charterers:

By   : Tugrul Tokgn
Title :   DIRECTOR

**ADDENDUM NO 3**

Dated 29 January 2013

**To the Bareboat Charter dated 23rd February 2010 (the "BBCP")
as amended by an Addendum No 1 dated 2nd June 2010
and by an Addendum No 2 dated 21st June 2010**

BETWEEN

Psara Energy Limited, of the Marshall Islands (the "Owners")

AND

Space Shipping Ltd, of Malta (the "Charterers")
Geden Holdings Ltd, of Malta (as "Guarantor")

Relating to the charter of the crude oil carrier m/t "CV Stealth" (the "Vessel")
pursuant to the terms and conditions of the BBCP.

With reference to the terms and conditions of the BBCP, it is hereby agreed and confirmed that:

1.  The payment of a portion of the daily charter hire of an amount of USD 3.225 arising from the charter hires starting 1st December 2012 until 1st December 2013 shall be deferred. With effect from 1st December 2013 the total amount of deferred charter hires as per this clause (i.e. USD 1.177.125) shall be repaid in proportionately equal instalments until 22nd June 2015 and added to the daily charter hire.

2.  Accordingly, the amount of USD 2.072 shall be added to the daily charter hire of Box 22 of the BBCP, from 1st December 2013 until 22nd June 2015.

3.  In the event of default of payment by the charterers under the bareboat charters of the Maltese flagged vessel "C.S. Stealth", then such event of default shall be considered as Charterers' Default under the present BBCP.

All other terms and conditions of the BBCP and its Addenda or supplemental agreements or undertakings thereto remain unaltered and in full force and effect.

----------------------- _Tiran Tkeer_
For and on behalf of
the Charterers

----------------------- _Tiran Tkeer_
For and on behalf of
the Guarantor

----------------------- 
For and on behalf of
the Owners

_Georgios Amanatidis_
_Sole Director_

ANNEX 4

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

## IRREVOCABLE PERFORMANCE GUARANTEE

In consideration of you, Psara Energy Limited / Marshall Island (hereinafter the "Company" ), entering into a Bareboat Charterparty and MoA as per rider clause 13 of "BARECON 2001" dated 23 February 2010 and any and all subsequent addenda thereto (the "Contract") with Space Shipping Ltd / Malta (the "Charterer") as charterer and or buyer, we, subject to the provision of the paragraphs below, Geden Holdings Ltd of Malta hereby unconditionally and irrevocably guarantee as primary obligor on first demand the full and timely performance by the Charterer of all its obligations under the Contract, including, but not limited to, the punctual payment of the hire and or the purchase price of the vessel MT CV STEALTH under the Charterparty according to the Contract, providing the Charterer with sufficient funds to fulfill the Contract, due and punctual payment to you of all amounts (if any) owing by the Charterer under or pursuant to the Contract.

Upon receipt your first written demand stating (i) that the claimed amount is due to you and remains unpaid for a period of seven (7) calendar days from the due date and (ii) copies of the hire statement for the relevant period, we especially undertake to make any payment which was due to you under the above-mentioned Contract but has not been paid on the due date by the Charterers to you to your account as specified in the Contract. Such demand is to specify the amount overdue and the date it was due.

A further consideration of the provision of this guarantee is your undertaking, confirmed by your countersignature hereunder, that subject to our payment of any overdue amount under this guarantee within 7 days of receipt of your demand, you will not execute your right of withdrawal of the Vessel as per the Contract and you will refrain from arresting or otherwise detaining any of our assets.

However, in the event of any dispute between you and the Charterer in relation to:

(1) whether the Charterers shall be liable to pay the sum to you and;

(2) consequently whether you shall have the right to demand payment from us;

and such dispute shall have been submitted either by the Charterers or by you to Arbitration in accordance with clause 30 part II of the Contract within seven (7) calendar days from the Charterers' receipt of your demand for repayment, then we shall be entitled to withhold and defer payment until the awards is published. We shall not be obligated to make any payment to you unless the judgement orders the Charterers to make repayment. If the Charterers fails to honour the judgement within seven (7) days after that the final judgement had been rendered in the proceedings then we shall pay to you to the extent the judgement orders.

Any compliance with a demand hereunder shall be under strict reservation of, and shall not constitute a waiver of, our and the Charterer's rights in Contract and in Law.

No amendments, additions or variations to or extensions of the Contract, nor the granting of any additional time or other forbearance to the Nominee by you, nor any act or omission by you, shall release us from liability under the terms of this guarantee.

This Guarantee shall come into full force and effect upon the delivery of the same to you and shall continue in force and effect from the time when the charter period commences for a period of  (7) seven years plus an additional period of further 12 months, in the case that the first option is declared by the Charterers in accordance with Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the second option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the third option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract. Notwithstanding the provisions hereinabove, in case we receive notification from you or from the Charterers stating that a claim covered by this Guarantee has been disputed and referred to Arbitration in accordance with the provisions of the Contract the period of validity of this Guarantee shall be extended until thirty (30) days after the final judgment shall be rendered in the proceedings. In such case, this Guarantee shall not be available unless and until such certified copy of the final awards in the Arbitration justifying your claim is presented to us or a written agreement between the parties terminating the dispute is presented to us.

When this Guarantee shall have expired as aforesaid, you will return the same to us immediately without any request or demand from us, but non-return shall not affect the expiry of our commitment hereunder.

This guarantee shall be governed by and construed in accordance with the laws of England and we agree to submit to the non-exclusive jurisdiction of the English High Court.

The address and full style details of the Guarantor are as follows:

Mailing address:
GEDEN HOLDINGS LTD
C/O
BUYUKDERE CADDESI
YAPI KREDI PLAZA A BLOK K-12
LEVENT-ISTANBUL-TURKIYE

E-mail address:
chartering@gedenlines.com
Tel. +90 212 319 51 00  Fax +90 212 283 1604

04, March, 2010                    GEDEN HOLDINGS LTD of MALTA

Countersigned:
04, March, 2010                    SUPER SHIPPING LTD of MALTA

ANNEX 5



**GEDEN LINES**

**GEDEN FLEET**

**TANKERS**

M/T Profit
M/T Blue
M/T Pink
M/T Reef
M/T Royal
M/T Blank
M/T Hero
M/T Center
M/T Aqua
M/T Action
M/T Bravo
M/T Power
M/T Value
M/T Target
M/T True
M/T Spike
M/T Avor
M/T Enjoy
M/T Marka
M/T Citron
M/T Citrus
M/T Acor
M/T Carry
M/T Rova
M/T Cotton
M/T Cargo
M/T Rock
M/T Rocket

**BULK CARRIERS**

M/V Proud
M/V Flash
M/V Pretty
M/V Angel
M/V Scope
M/V Cash
M/V Fantastic
M/V Asia
M/V Amazing
M/V World
M/V South
M/V Capital

M/V Metropol
M/V Secret
M/V Sharp
M/V West
M/V East
M/V Namrun
M/V Tarsus
M/V Spot
M/V Clear

**FLEET UNDER MANAGEMENT**

CV Stealth
CS Stealth
M/T Bull
M/T Buddy

# Contact

**GEDENLINES**
GENEL DENIZCILIK NAKLIYATI A.S. Büyükdere Cad. Yapı Kredi Plaza
A Blok K:12 34330 Levent - Istanbul - Turkey

**Phone:** + 90 (212) 319 51 00
**Fax    :** + 90 (212) 283 16 04-05

gedenlines@gedenlines.com

Yapı Kredi Plaza Levent Mh. Cömert Sk. (A-Blok, No:1A) K:12 34330 Levent - Istanbul - Turkey
Phone: + 90 (212) 319 51 00   Fax:+ 90 (212) 283 16 04-05
gedenlines@gedenlines.com




ANNEX 6


Ship info

| IMO number : | 9472634 | |
|---|---|---|
| Name of ship : | POWER | (since 01/09/2011) |
| Call Sign : | 9HA2748 | |
| MMSI : | 215511000 | |
| Gross tonnage : | 61336 | (since 01/09/2011) |
| DWT : | 116087 | |
| Type of ship : | Crude Oil Tanker | (since 01/09/2011) |
| Year of build : | 2011 | |
| Flag : | Malta | (since 01/09/2011) |
| Status of ship : | In Service/Commission | (since 22/09/2011) |
| Last update : | 14/05/2013 | |

▶ **OVERVIEW**

| Overview | Value |
|---|---|
| The ship is classed by (at least) one of the IACS member societies | Yes |
| The ship's flag is not on the black list of the Paris MoU | Yes |
| The ship's flag is on the white list of the Paris MoU | Yes |
| The ship's flag is not on the black list of the Tokyo MoU | Yes |
| The ship's flag is on the white list of the Tokyo MoU | Yes |
| Percentage of inspections having led to a detention in last 36 months | 0.0 % |
| The ship's flag is not on the targeted list of the USCG | No |

▶ **MANAGEMENT DETAIL**

| IMO number | Role | Name of company | Address | Date of effect |
|---|---|---|---|---|
| 0098122 | ISM Manager | GENEL DENIZCILIK NAKLIYATI AS | Kat 12, Blok A, Yapi Kredi Plaza, Buyukdere Caddesi Levent Mah, Besiktas, 34330 Istanbul, Turkey. | since 23/09/2011 |
| 0098122 | Ship manager | GENEL DENIZCILIK NAKLIYATI AS | Kat 12, Blok A, Yapi Kredi Plaza, Buyukdere Caddesi Levent Mah, Besiktas, 34330 Istanbul, Turkey. | since 22/09/2011 |
| 5050125 | Registered owner | BARBAROS MARITIME LTD | Care of Genel Denizcilik Nakliyati AS (GEDEN LINES), Kat 12, Blok A, Yapi Kredi Plaza, Buyukdere Caddesi Levent Mah, Besiktas, 34330 Istanbul, Turkey. | since 22/09/2011 |

▶ **CLASSIFICATION STATUS**

| Classification society | Date change status | Status | Reason |
|---|---|---|---|
| Det Norske Veritas | since 23/09/2011 | Delivered | |

▶ **CLASSIFICATION SURVEYS**

| Classification society | Date of last renewal survey | Date of next renewal survey |
|---|---|---|
| Det Norske Veritas | 23/09/2011 | 23/09/2016 |

▶ **SAFETY MANAGEMENT CERTIFICATE (RECOGNISED ORGANISATIONS)**

| Classification society | Date survey | Date expiry | Date change status | Status | Reason | C/V |
|---|---|---|---|---|---|---|
| Det Norske Veritas | 23/12/2011 | 23/12/2016 | 23/12/2011 | Delivered | | Convention |

Case 3:13-cv-00239   Document 1-3   Filed in TXSD on 06/27/13   Page 91 of 109

▶ **P&I INFORMATION**

| Name of P&I insurer | Date of inception |
|---|---|
| Steamship Mutual Underwriting Association (Bermuda) | 10/06/2013 |

Equasis's contributors :



*© Copyright 2000-2011; Version : prodPv2.6.4; Developed and hosted by French Ministry for Transport -DAM/SI-Saint-Malo*

# ANNEX 7

DNV Exchange - POWER - Owner                                                                6/23/13 1:33 PM

DNV Exchange
Vessel Info
                                                    Log on

⌂ exchange home > registry > power > overview > owner
                                                                                              |

VESSEL
**POWER**

| DNV ID: | 29370 | IMO No: | 9472634 |
| **Operational Status:** | **In Operation** | Class Relation: | In DNV Class |

**Overview**    🟡 **Status**

Summary  Dimensions  Classification  Registry  Hull Summary  Machinery Summary  Yard  Owner

| Owner: | Barbaros Maritime Ltd. |
| | (10037695) |
| | |
| Manager: | Genel Denizcilik Nakliyati A.S. |
| | (103575)  (LRF / Company identification no: 0098122) |
| | |
| ISM/DOC Holder: | Genel Denizcilik Nakliyati A.S. |
| | (103575)  (LRF / Company identification no: 0098122) |

---

| Vessel Name: | [                    ] | DNV ID: | [      ] | IMO No: | [      ] | Go! |

| My Recent Vessels: | POWER |

---

Copyright © 2013 DET NORSKE VERITAS        Liability        Contact Us

ANNEX 8



Click on the Document Icon 🔍 to the left of a record to display a COFR Confirmation in html. You may print the COFR Confirmation by right clicking your mouse and selecting "print" from the list.

| | VESSEL NAME | VESSEL TYPE | HULL TYPE | GROSS TONNAGE | COFR NUMBER | EFFECTIVE DATE | EXPIRATION DATE | COFR APPLICANT | VIN | INSURANCE CANCEL FLAG |
|---|---|---|---|---|---|---|---|---|---|---|
| 🔍 | ANTARCTIC | TANKER | | 85421 | 865650 - 16 | 7/1/2013 | 7/1/2016 | POWERFUL SHIPPING S.A. | L9315185 | |
| 🔍 | MARINA | DRY BULK CARRIER | | 39783 | 857156 - 16 | 1/5/2012 | 1/5/2015 | POWER TRANSPORTATION SPECIAL MARITIME ENTERPRISE | L9180918 | |
| 🔍 | POWER | TANKER | | 61336 | 841057 - 16 | 10/5/2011 | 10/5/2014 | GENEL DENIZCILIK NAKLIYATI A S | L9472634 | |
| 🔍 | POWER D | TANKER | | 161306 | 868030 - 16 | 12/13/2011 | 12/13/2014 | POWER D SHIPPING COMPANY LIMITED | L9241102 | |
| 🔍 | POWER RANGER | DRY BULK CARRIER | | 26330 | 852537 - 16 | 5/23/2011 | 5/23/2014 | MAXUM STEAMSHIP LTD. | L9123740 | |
| 🔍 | POWER STEEL | DRY BULK CARRIER | | 38881 | 853114 - 19 | 10/20/2012 | 10/20/2015 | OCEAN TRANSIT CARRIER S.A. | L9195327 | |
| 🔍 | POWERFUL | DRY BULK CARRIER | | 38639 | 857340 - 15 | 5/14/2011 | 5/14/2014 | FOUNTAIN SERVICES LIMITED | L9042233 | |

< Prev Next >

*USCG Home* • *Privacy Policy* • *Customer Accessibility*
Contact the *Accessibility Coordinator* for comments and inquiries about accessibility.

*Version 3.6 -- This version is designed for Internet Explorer.*

# ANNEX 9

Steamship Mutual - Results Content - Vessel Details                                                    6/23/13 12:59 PM



Search this site...

| Home | About Us | Rules & Covers | Loss Prevention | Liabilities & Claims | Publications | Correspondents | Contact Us | Vessel Search | Cookies |

**Locate a Vessel**

To search for a vessel, select either Vessel Name or IMO Number from the dropdown and enter the relevant details or first part into the search field.

Please note that the List of Entered Vessels does not include entries by charterers.

**Vessel name**

If you have any queries about the List of Entered Vessels, please contact us

**POWER Vessel Details**

| Vessel | POWER |
|---|---|
| Member | Genel Denizcilik Nakliyati A.S. |
| IMO Number | 9472634 |
| Vessel Type | Tanker |
| Port of Registry | VALLETTA |
| Gross Tonnage | 61336 |
| Syndicate | European |

**Syndicate Contacts**



**Darren Webb**
*Syndicate Manager Underwriting*
Direct Tel: +44 (20) 7650 6631
Email: darren.webb@simsl.com

Email these details

**Neil Gibbons**
*Syndicate Manager Claims*
Direct Tel: +44 (20) 7650 6552
Email: neil.gibbons@simsl.com

© 2013                                                    Cookies | Sitemap | Disclaimer | Login | Text Only | Print this Page

# ANNEX 10

## ADDENDUM NO. 1

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

Box 4 of the Barecon Charter Party should read:

"Geden Holdings Limited, Malta or nominee always guaranteed by Geden Holdings Limited, Malta. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed."

IN WITNESS WHEREOF, the parties have caused this Addendum No.1 to be duly executed in Copenhagen on this 2nd day of June 2010.

Owners :                                          Charterers:

By   : Himoza Dimareli              By  :  Toupvn Tolffor
Title : Director                            Title :  Director

## ADDENDUM NO. 2

Charter Party dated 23rd February 2010 for
M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

**Box 22 of the Barecon Charter Party should read:**
USD 8,750 gross pdpr for the first 365 days after delivery
USD 9,750 gross pdpr for the 2nd charter year
USD 10,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year
USD 9,750 gross pdpr for the 4th charter year
USD 9,750 gross pdpr for the 5th charter year
USD 13,250 for the optional period.

**Clause 13 of Rider Clauses:**
To be deleted.

**Delivery:**
Delivery is agreed to be effected when inventory count is completed and agreed between the parties onboard the vessel.

IN WITNESS WHEREOF, the parties have caused this Addendum No.2 to be duly executed in Copenhagen on this 21st day of June 2010.

Owners :

By   : Mimoza Dimareli
Title :   DIRECTOR

Charterers:

By  : Tugran Tokan
Title :   DIRECTOR

**ADDENDUM NO 3**

Dated 29 January 2013

**To the Bareboat Charter dated 23rd February 2010 (the "BBCP")**
**as amended by an Addendum No 1 dated 2nd June 2010**
**and by an Addendum No 2 dated 21st June 2010**

BETWEEN

Psara Energy Limited, of the Marshall Islands (the "Owners")

AND

Space Shipping Ltd, of Malta (the "Charterers")
Geden Holdings Ltd, of Malta (as "Guarantor")

Relating to the charter of the crude oil carrier m/t "CV Stealth" (the "Vessel")
pursuant to the terms and conditions of the BBCP.

With reference to the terms and conditions of the BBCP, it is hereby agreed and confirmed
that:

1.  The payment of a portion of the daily charter hire of an amount of USD 3.225 arising
    from the charter hires starting 1st December 2012 until 1st December 2013 shall be
    deferred. With effect from 1st December 2013 the total amount of deferred charter
    hires as per this clause (i.e. USD 1.177.125) shall be repaid in proportionately equal
    instalments until 22nd June 2015 and added to the daily charter hire.

2.  Accordingly, the amount of USD 2.072 shall be added to the daily charter hire of Box
    22 of the BBCP, from 1st December 2013 until 22nd June 2015.

3.  In the event of default of payment by the charterers under the bareboat charters of the
    Maltese flagged vessel "C.S. Stealth", then such event of default shall be considered as
    Charterers' Default under the present BBCP.

All other terms and conditions of the BBCP and its Addenda or supplemental agreements or
undertakings thereto remain unaltered and in full force and effect.

----------------------
For and on behalf of
the Charterers

----------------------
For and on behalf of
the Guarantor

----------------------
For and on behalf of
the Owners

Georgios Amanatidis
Sole Director

ANNEX 11

# STEALTH MARITIME CORPORATION S.A.
331, KIFISIAS AVE., 14561 KIFISIA
P.O. Box 52939,14610
KIFISIA GREECE

| M/S: | SPACE SHIPPING LTD<br>198 OLD BAKERY STREET<br>VALLETTA, MALTA | | **DEBIT NOTE** |
|---|---|---|---|
| | | Date: | 15-Apr-13 |
| | | Currency: | USD |
| | | No: | T0110/DN/39 |

**M/V    C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10**

| Description | Debit | Credit |
|---|---|---|
| Bare boat charter hire calculation | | |
| Billing Period:       36 | | |
| From 01-May-13 00:00  to 31-May-13 24:00 | | |
| Hire Rate:         7,525.00 USD/per Day | | |
| Total Days:       31.00000 | | |
| **Bare boat hire daily** (01-May-13 00:00-31-May-13 24:00) | $233,275.00 | |
| Total amount USD | $233,275.00 | $0.00 |
| Balance Due | | $233,275.00 |

Hire is payable as per charter party to:

ALPHA  BANK
SHIPPING BRANCH (CN 960)
89 AKTI MIAOULI STREET
GR 185 38 PIRAEUS -GREECE
TEL: 210-4290208, 4290116
FAX: 210-4290348
SWIFT CODE: CRBAGRAA
IBAN:
INTO ACCOUNT:
IN FAVOUR OF: STEALTH MARITIME CORPORATION SA
USD CORRESPONDENT:
JP MORGAN CHASE BANK
1, CHASE MANHATTAN PLAZA
NEW YORK, NY 10081 - USA
SWIFT ADDRESS: CHASUS33XXX

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

# STEALTH MARITIME CORPORATION S.A.
### 331, KIFISIAS AVE., 14561 KIFISIA
### P.O. Box 52939,14610
### KIFISIA GREECE

| M/S: | SPACE SHIPPING LTD | | | **DEBIT NOTE** |
|---|---|---|---|---|
| | 198 OLD BAKERY STREET | Date: | | 16-May-13 |
| | VALLETTA,MALTA | Currency: | | USD |
| | | No: | | T0110/DN/40 |

## M/T    C.V.STEALTH / T0110 / GEDEN (SPACE) / CP Date: 23-Feb-10

| Description | Debit | Credit |
|---|---|---|
| Bare Boat Charter time Calculations | | |
| Billing Period:      37 | | |
| From 01-Jun-13 00:00  to 22-Jun-13 11:00 | | |
| Hire Rate:          7,525.00 USD/per Day | | |
| Total Days:        21.45833 | | |
| From 22-Jun-13 11:00  to 21-Jun-13 24:00 | | |
| Hire Rate:          6,525.00 USD/per Day | | |
| Total Days:        8.54167 | | |
| **Bare boat hire daily**  (01-Jun-13 00:00-30-Jun-13 24:00) | $217,208.33 | |
| Total amount USD | $217,208.33 | $0.00 |
| Balance Due | | $217,208.33 |

Hire is payable as per charter party to:

ALPHA  BANK
SHIPPING BRANCH (CN 960)
89 AKTI MIAOULI STREET
GR 185 38 PIRAEUS -GREECE
TEL: 210-4290208, 4290116
FAX: 210-4290348
SWIFT CODE: CRBAGRAA
IBAN:
INTO ACCOUNT: '
IN FAVOUR OF: STEALTH MARITIME CORPORATION SA
USD CORRESPONDENT:
JP MORGAN CHASE BANK
1, CHASE MANHATTAN PLAZA
NEW YORK, NY 10081 – USA
SWIFT ADDRESS: CHASUS33XXX

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

ANNEX 12

# INCE & CO | INTERNATIONAL LAW FIRM

# EMAIL

| From | Our reference | Date |
|---|---|---|
| Jeremy Biggs/Jane Fitzgerald | JB/JF/8218/8732 | 13 June 2013 |

| To | Attention | Your reference |
|---|---|---|
| Michael Baker-Harber | Michael Baker-Harber | |

| Total number of pages | | Email address |
|---|---|---|
| | | mbh@mbharb.fsnet.co.uk |

| Copies to | Attention | Email address |
|---|---|---|
| | | |

| Matter |
|---|

## CV Stealth - C/P 23 February 2010

## Unpaid Hire

We act for Psara Energy Limited, as Owners ("Owners") under the above-captioned bareboat charterparty entered into between our clients and Space Shipping Ltd as charterers ("Charterers") in respect of the above vessel.

Our clients have a claim for unpaid hire.

The bareboat charterparty requires (Clause 30(a) of Barecon 2011) that disputes are referred to a tribunal of three arbitrators, one to be appointed by each of the parties, and the third by the two so chosen.  Owners wish to appoint you as their arbitrator in respect of all disputes with Charterers arising under the bareboat charterparty.

We would be grateful if you could please provide written confirmation of acceptance of this appointment.

Yours faithfully

**Ince & Co LLP**

Ince & Co LLP
International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel   +44 (0)20 7481 0010
Fax  +44 (0)20 7481 4968
incelaw.com

Ince & Co LLP is a limited liability partnership registered in England and Wales (with registered number OC361858) and is authorised and regulated by the Solicitors Regulation Authority. A full list of members is available for inspection at our registered office, International House, 1 St Katharine's Way, London E1W 1AY.

Beijing     Dubai     Hamburg     Hong Kong     Le Havre     London     Monaco     Paris     Piraeus     Shanghai     Singapore

1.13.2563.00 19261733

ANNEX 13

**INCE** &CO | INTERNATIONAL LAW FIRM

Geden Holdings Ltd
C/O Buyukdere Caddesi
Yapi Kredi Plaza A Blok K-12
Levent
Istanbul
Turkey

Your ref:

Our ref: JB/JF/8218/8732

Date: 21 June 2013

**By Courier/Email/Fax**

For the attention of Tugrul Tokgoz

Email: chartering@gedenlines.com
Fax: +90 212 283 1604

Dear Sirs

## Irrevocable Performance Guarantee dated 04 March 2010
## CV Stealth

We are instructed by Psara Energy Limited who are the beneficiary (the "Company") under an Irrevocable Performance Guarantee dated 4 March 2010 (the "Guarantee") issued by Geden Holdings Ltd (the "Guarantor") in relation to a bareboat charter dated 23 February 2010 (the "Contract") in respect of CV STEALTH (the "Vessel") entered into between the Company and Space Shipping Ltd (the "Charterer").

Pursuant to the Guarantee, the Guarantor unconditionally and irrevocably guarantees as primary obligor on first demand the full and timely performance by the Charterer of all its obligations under the Contract, including, but not limited to, the punctual payment of the hire under the Contract.

We hereby provide you with a <u>first written demand</u> under the Guarantee for payment by the Guarantor to the Company of the sum of US$450,483.33. Hire in the amounts of US$233,275 (for May 2013) and US$217,208.33 (for June 2013) are overdue and were due for payment on 30 April 2013 and 31 May 2013 respectively. The claimed amount is due to the Company and remains unpaid for a period of seven (7) calendar days from the due date. We enclose copies of the hire statements for each of the relevant periods, together with the relevant hire invoices.

In light of the above, please urgently make payment of the above sums to the Company ensuring that such sums are received by them, in full, **within latest 7 days from receipt of this first written demand.**

If payment is not received as demanded above, the Company shall be entitled to:

Ince & Co LLP
International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel   +44 (0)20 7481 0010
Fax   +44 (0)20 7481 4968
incelaw.com

Ince & Co LLP is a limited liability partnership registered in England and Wales (with registered number OC361858) and is authorised and regulated by the Solicitors Regulation Authority. A full list of members is available for inspection at our registered office, International House, 1 St Katharine's Way, London E1W 1AY.

Beijing    Dubai    Hamburg    Hong Kong    Le Havre    London    Monaco    Paris    Piraeus    Shanghai    Singapore

1.13.2563.00 19293669

INCE & CO | INTERNATIONAL LAW FIRM

21 June 2013

(i)     commence English High Court proceedings under the Guarantee without further notice; and/or

(ii)    seek security for the Company's claim against the Guarantor without further notice, including by way of arrest any of the Guarantor's assets; and/or

(iii)   withdraw the Vessel from the Charterer's service under the Contract and/or terminate the Contract for the Charterer's breach of condition and/or repudiatory breach.

This demand letter is wholly without prejudice to the Company's rights under the Guarantee. All of the Company's rights are fully reserved.

Your urgent attention is required in order to avoid the further unnecessary escalation of this matter.

We look forward to receiving your urgent and positive response.

Yours faithfully

*Ince & Co LLP*

**Ince & Co LLP**